UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-CR-23 (KMM/LIB)

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S MOTION** |
| | ) | **TO DISMISS** |
| v. | ) | |
| | ) | |
| Trina Mae Johnson, | ) | |
| | ) | |
| Defendant. | ) | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The defendant, Trina Mae Johnson, through and by her lawyer, Paul Engh,

and in accordance with Rule 12(b)(3)(A)(ii) and (iii) and (B), moves the Court for

an Order dismissing the Indictment.  By this prosecution she has been denied her

right of equal protection and her right of a speedy trial and the rights assured under

the Indian Civil Rights Act of 1968, the Sixth Amendment and the Fourteenth

Amendment.

## A. **Introduction**

In this District Court, there is a perception amongst Red Lake Indian

Reservation members and those of us who represent them, that the local Tribal

Court is being manipulated by the Department of Justice.  Just like what happened

to Ms. Johnson, a Native American Red Lake member is often arrested on a federal

charge masked as a Tribal code violation and then is held in the Red Lake jail.  If,

as here, it's a serious crime of violence, Federal Agents are intimately involved in the investigation from the get go. The FBI, as here, conducts the majority of interviews, including jail interviews designed to obtain a complete confession before the Red Lake Indian is presented in Court, and without ever having the benefit of licensed counsel to advise her. The local jail becomes that Indian's new home for the unforeseeable future.

What happens next is that the Red Lake Indian is arrested by the FBI on the last day of her sentence, or upon release, as here, for health reasons (Ms. Johnson's cancer diagnosis that, of course, wasn't sufficiently treated in the jail setting) and brought before this Court for further process.

The Red Lake Indian now faces a far harsher penalty than the one year cap for an identical charge. See 25 U.S.C. 1302(a)(7)(C). Compare the penalties for assault and its ten year statutory maximum for an adult victim, 18 U.S.C. 113(a)(6) (serious bodily injury). To say nothing of the alleged torture count in this case.

This Court has previously declined our invitation to find what the defense bar has considered immutable, i.e., the federal law enforcement's improper use of the tribal court to gain access to evidence and concomitant delay that, in state or federal court, could not be obtained otherwise. United States v. Lussier, 21-CR-145 (PAM/LIB), Docket Entry 94, Report and Recommendation at p. 11 (noting

the "cooperation between Red Lake law enforcement and federal law enforcement authorities" with the finding that defendant's due process claim is a "mere conjecture").

We disagree, persist. This case presents far more compelling facts than did the <u>Lussier</u> scenario where the defendant admitted the same offenses which were subsequently indicted. Despite being in jail for 159 days, Ms. Johnson wasn't even near a set trial date.

She has been denied her Fourteenth Amendment "equal protection of the laws" memorialized in the Indian Bill of Rights of 1968, 25 U.S.C. 1302(D)(8). Her right to a speedy trial, also guaranteed, has already been eviscerated. Our claims find resonance in the jurisdictional competition for criminal prosecutions of the Native American. A case recently decided by the United States Supreme Court is also instructive.

## B. <u>The Intersection of Federal, Minnesota and Tribal Courts and the Doctrine of Sovereignty</u>

We begin with the rules of jurisdiction.

Ms. Johnson's status as an Indian afforded the Red Lake Tribal Court jurisdiction, which was not to her advantage here. Had she been of a different race, White, Black, or Asian say, the Red Lake Tribal Court would have had no jurisdiction over her. <u>Oliphant v. Suquamish Indian Tribe</u>, 435 U.S. 191, 195

(1978); Public Law 280, 18 U.S.C. 1162(a).

Until the Supreme Court's last term, there was likewise no jurisdiction in the Minnesota state court over the Indian who commits an offense on Indian land. State v. Stone, 572 N.W.2d 725, 728 (Minn. 1997).

An Indian who committed a major felony against either another Indian or non-Indian falls within the exclusive jurisdiction of the United States. 18 U.S.C. 1153(a). A non-Indian who commits a major felony on the reservation is also subject to federal jurisdiction. 18 U.S.C. 1152. But the Minnesota District Court still has jurisdiction over the Indian who was not a member of the tribe who commits an offense in, say, the White Earth Reservation. See State v. R.M.H., 617 N.W.2d 556 (Minn. 2000).

Public Law 280, 18 U.S.C. 1162(a), granting certain states broad jurisdiction over "offenses committed by or against Indians in the areas of Indian country," contains a provision that state court jurisdiction extends to "all Indian country within the State, except the Red Lake Reservation." Id. Minnesota State Court jurisdiction, under Public Law 280, hence has been limited by the case law to regulatory offenses. See generally State v. Stone, 729 N.W.2d 1, 12 (Minn. 2007)(failing to register as a sex offender).

In United States v. Lussier, 21-CR-145 (PAM/LIB), we asked this Court to

4

consider the recent rulings in <u>Oklahoma v. Castro-Huerta</u>, 142 S.Ct. 11486 (2022) and <u>McGirt v. Oklahoma</u>, 140 S.Ct. 2452 (2020) with respect to Public Law 280, and how, in light of these decisions, the law had changed to the benefit of Red Lake defendants charged in federal court. This Court ruled that <u>Castro-Huerta</u> had "no application to the Red Lake Nation," and worked "no change whatsoever in the well established federal Indian law applicable . . ." <u>Lussier</u> Report and Recommendation at p. 25, n. 21. Judge Magnuson affirmed without discussion of this Court's analysis. Memorandum and Order; Docket Entry 96, p. 2.

We respectfully disagree with the <u>Lussier</u> decisions. <u>McGirt</u>, <u>Castro-Huerta</u>, and <u>Haaland v. Brackeen</u> provide the basis.

## C. <u>McGirt</u>

The issue in <u>McGirt</u> was whether, in light of past treaties affording exclusive federal jurisdiction, the State of Oklahoma "has no right to prosecute Indians for crimes committed in a portion of Northeastern Oklahoma that includes most of the city of Tulsa." And whether "[r]esponsibility to try these matters would fall instead to the federal government and Tribe." <u>McGirt</u>, 140 S.Ct. at 2460.

Justice Gorsuch wrote <u>McGirt</u> to be a landmark opinion, with prose of largess. He didn't cabin the case. The opinion begins: "On the far end of the Trail of Tears was a promise." <u>Id</u>. at 2458. And ends with: "The federal government

5

promised the Creek a reservation in perpetuity. . .Congress has never withdrawn

the promised reservation.  As a result, many of the arguments before us today

follow a sadly familiar pattern."  "Yes, promises were made, but the price of

keeping them has become too great, so now we should just cast a blind eye.  We

reject that thinking. . . .  To hold otherwise would be to elevate the most brazen and

longstanding injustices over the law, both rewarding wrong and failing those in the

right."  Id. at 2482.

The essential holding of McGirt, for our purposes, is this:  "Only the federal

government, not the State, may prosecute Indians for major crimes committed in

Indian Country."  Id. at 2478.  Hence McGirt held that the federal courts had

exclusive jurisdiction over major crimes committed on the Creek Nation

Reservation, which encompassed Tulsa and surrounding area.  Id. at 2492.

In so ruling, Justice Gorsuch discussed the exception created by Public Law

280, 18 U.S.C. 1162.  Id.  Public Law 280 was the basis for this Court's Lussier

Report and Recommendation, at p. 26, n. 21 (noting that Public Law 280, as

applied to Red Lake, and "unlike Indian Country in Oklahoma, specifically

excluded by Congress from being subject to the concurrent state criminal

jurisdiction of the State of Minnesota").  Was this Court's narrow interpretation of

McGirt and its recognition of Public Law 280 correct?  We don't believe so.

Not long after <u>McGirt</u> was decided, the Supreme Court's balance of liberal vs. conservative changed.  Long standing precedent was all of the sudden reversed.  <u>Compare</u> <u>Roe v. Wade</u>, 410 U.S. 113 (1973)(a liberal 7-2 majority finding a woman's right to an abortion to be a protected right) with <u>Dobbs v. Jackson Women's Health Organization</u>, 142 S.Ct. 2228 (2022) (By a 5-1-3 vote the conservative majority overruled <u>Roe</u>).

### D. <u>Castro-Huerta</u>

With the confirmations of Justices Kavanaugh and Barrett, the philosophical center of the Supreme Court shifted with respect to Indian law.  That portion of <u>McGirt,</u> which concerned delineation of state and federal jurisdiction <u>vis-a-vis</u> Public Law 280, decided on a 5-4 vote, was in practical effect overruled in <u>Castro-Huerta</u>.

Justice Kavanaugh, writing for a new majority (joined by Justice Barrett), held that Federal Government and the State have <u>concurrent</u> jurisdiction to prosecute crimes committed by non-Indians against Indians in Oklahoma Indian Country.  <u>Id</u>. at 2491.  That had not been the law just two years earlier.  Nor was the ruling consistent with 18 U.S.C. 1152.

Justice Kavanaugh's <u>Castro-Huerta</u> opinion was hardly ambiguous:  "unless preempted, States have jurisdiction over crimes committed in Indian Country."  <u>Id</u>.

at 2493. Because, he wrote, "Indian Country is part of a State, not separate from a State." Id. at 2502.

Castro-Huerta discussed the applicability of Public Law 280, which, as noted, formerly barred Minnesota from criminal jurisdiction over offenses occurring on the Red Lake Reservation. But according to Justice Kavanaugh, "[t]he text of the Act simply 'extend[s]' federal law to Indian country, leaving untouched the background principle of state jurisdiction over crimes committed within the State, including in Indian country." Id. at 2495 (emphasis added). In his view, Public Law 280 does not "say that Indian country is equivalent to a federal enclave for jurisdictional purposes. Nor does the Act say that federal jurisdiction is exclusive in Indian country, or that state jurisdiction is preempted in Indian Country." Id. at 2495. "Nothing in the language or legislative history of Pub.L. 280 indicate that it was meant to divest States of pre-existing and otherwise lawfully assumed jurisdiction." Id. at 2499-2500 (quoting Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering, P.C., 467 U.S. 138, 150 (1984)).

Thus, he concluded, "Public Law 280 also grants States jurisdiction over crimes committed by Indians." Id. at 2500. "So our resolution of the narrow jurisdiction issue in this case does not negate the significance of Public Law 280 in

8

affording States broad criminal jurisdiction over other crimes committed in Indian country, such as crimes committed by Indians." Id.

Justice Gorsuch, who lost two votes from his McGirt majority, found himself reversed. His Castro-Huerta dissent criticized the majority's holding that there is "inherent" authority for the State to try crimes committed on an Indian Reservation. A ruling, he observed, that makes a "mockery" of Public Law 280 among other jurisdictional laws. Id. at 2518. "Unknown to anyone until today, state law applied all along." Id. at 2517.

Justice Gorsuch wasn't just addressing what would happen, with respect to an Indian reservation in Oklahoma, when claiming that Justice Kavanaugh's opinion was just plain wrong: "The source of the Court's error is foundational." Id. at 2511. "Because Tribes are sovereigns, this Court has consistently recognized that the usual 'standards of pre-emption' are 'unhelpful'". Id. at 2512 (quoting White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143 (1980)). No longer.

In light of Justice Gorsuch's dissent, we disagree with this Court's conclusion, reached in Lussier, that "[n]othing in Castro-Huerta diminished the Red Lake Nation's existence as a distinct sovereign entity or the long standing dual sovereign doctrine," Report and Recommendation at p. 24.

We disagree, too, with this Court's finding that the Castro-Huerta ruling is

"narrow" based upon "specific facts," <u>Lussier</u> Report and Recommendation at p. 25, having no application to the Red Lake Reservation.  <u>Id</u>. at 25, n. 21, and that the Supreme Court's decision matters only in "Indian country in Oklahoma."  <u>Id</u>.

Yes, <u>Castro-Huerta</u> dealt with the non-Indian victimizing an Indian, and State court jurisdiction for a non-Indian on Indian crime on the reservation was "a question not before" the Supreme Court.  <u>Id</u>. at 2495, at n. 2.  The majority and dissenting opinions both speak to an issue yet to be resolved.  And that is whether Red Lake Reservation and its Tribal Court can still be considered a sovereignty.

This Court has erred before in its interpretation of Indian law.  <u>See</u> <u>e.g.</u>, <u>United States v. Brown</u>, 777 F.3d 1025 (8th Cir. 2015) (affirming Judge Tunheim's interpretation of Minnesota Indian treaty law, which had rejected this Magistrate Judge's contrary opinion).  After <u>Castro-Huerta</u>, the claim that the tribe has "inherent sovereign authority," <u>Michigan v. Bay Mills Indian Cmty.,</u> 572 U.S. 782, 788 (2014), is no longer settled.  The old definition of "Tribal sovereignty," i.e., "criminal laws of the states 'can have no force' on tribal members within tribal bounds unless and until Congress clearly ordains otherwise," <u>Castro-Huerta</u>, Justice Gorsuch, dissenting, <u>Id</u>. at 2510, is unpersuasive in light of Justice Kavanaugh's majority's opinion worth repeating:  "Indian country is part of a state, not separate from a state."  <u>Id</u>. at 2502.

Castro-Huerta invites a ripe comparison to this case: the due process and equal protection afforded in Tribal Court, when compared to the Minnesota and federal courts. It's a comparison that can no longer be insulated by Ms. Johnson's Red Lake membership in a "quasi-sovereign state[]." Cavanaugh, 643 F.3d 592, 605, 606 (8th Cir. 2011) (quoting United States v. Antelope, 430 U.S. 631, 644, 646 (1977)). As Justice Gorsuch has pointed out in his dissent, Indian Reservations, and this includes Red Lake, no longer have "tribal self-government." Id. at 2526. Now, in its majority opinion, Castro-Huerta has "intruded on the feature of tribal sovereignty recognized since the founding." Id. at 2525.

It can no longer be said, as it has been over and over again, that the reason a Native American doesn't receive the same rights in the Tribal court setting is somehow, someway, beyond review because it is "tied rationally to the fulfillment of Congress' unique obligation toward the Indians," Morton v. Mancari, 417 U.S. 535, 554-555 (1974), cited in United States v. Stately, 19-cr-342 (ECT/LIB), Opinion and Order, at p. 8; Docket Entry 161. After Castro-Huerta, the Government's obligation to the tribe is no longer unique.

Ms. Johnson's remedy for constitutional violations is not to sue the Tribal Court authorities. Santa Clara Pueblo v. Martinez, 436 U.S. 49, 60 (1978)(discussing tribal court immunities). Her only remedy, rather, is to litigate

the different treatment for Indians when compared to non-Indians charged with the same crimes in Red Lake in this venue.

### E. Haaland v. Brackeen

In Haaland v. Brackeen, 994 F.3d 249 (5th Cir. 2021)(en banc), the "constitutionality of the Indian Child Welfare Act (ICWA), 25 U.S.C. Sec. 1901 et seq." was challenged. Id. at 265. Under the ICWA, the local Tribal Court has jurisdiction over the Indian child living on a reservation, with state court concurrent jurisdiction if the child is living off-reservation. Id. at 286, 363. Multiple issues were presented. The essential one, for our purposes, was whether non-Indian families were denied equal protection under the law by the ICWA's adoptive placement preference for "other Indian families" and the like preference for placement in an "Indian foster home," Id. at 268 (quoting 25 U.S.C. 1915 (a)(3)), given that these preferences were based upon race. Id. at 288-89.

The Brackeen Circuit opinion is 325 pages of dense text, illustrating the fundamental disagreements the en banc Court had in interpreting Indian law. Reading the opinion, we're reminded of the age old adage that reasonable minds can differ. Brilliant jurists in the Fifth Circuit couldn't agree, were almost evenly split.

Before dispensing with our equal protection claims this Court has rejected in

Lussier and Stately, hear us out.

The Brackeen majority's ruling was that the ICWA, with its designation of the "Indian Child" and a preference for Indian family adoption and foster care, and the provision which allowed the state court to decide custodial issues, did "not offend equal protection principles because they are based on a political classification and are rationally related to the fulfillment of Congress's unique obligation toward Indians." Id. at 361. There was no constitutional impediment to the law's blending of jurisdictions; the local adoption state court, and by Department of Interior rule, could decide federal law for the off-reservation child. Id. at 315-345.

In a long and persuasive dissent, Justice Duncan agreed with the plaintiffs' claim that the ICWA "violates equal protection: (1) by treating 'Indian children' differently from non-Indian children; and (2) by preferring 'Indian families' over non-Indian families." Id. at 392. Both classifications, he discerned, "exist in the twilight between tribe and race." Id. at 396 (emphasis added). The "ICWA's separate standards for Indian children – standards which govern state proceedings, applies to children with tenuous connections to a tribe, and allow birth parents' wishes to be overridden – fails to rationally further tribal interests." That the "ICWA's preference for Indian over non-Indian families, which is divorced from

Congress's goal of keeping children linked to their tribe." Id. at 396.

Justice Duncan also opined that the ICWA's blending of state and federal law - the preferences with the requirement of state court determinations thereof - to run afoul of the preemption doctrine, a doctrine grounded in the Supremacy Clause that holds where federal law conflicts with state law, the federal law "can trump contrary state law." Id. at 412-413 (quoting Butler v. Coast Elec. Power Ass'n., 926 F.3d 190, 195 (5th Cir. 2019)(citing Arizona v. United States, 567 U.S. 387, 398-99 (2012). The ICWA conflicted with local state law in the Tribe's right to intervene (missing from state law), the different standards of proof (beyond a reasonable doubt for termination as opposed to the state standard of clear and convincing evidence) and the availability of expert witnesses. Id. at 413-415.

Justice Duncan concluded that because the ICWA sought to regulate state authorities, the preemption provisions, including the preference placement and the delegation of custodial determinations to the state court, were not valid. Id. at 419.

The Supreme Court granted certiorari on the following questions:

(1) Whether the Indian Child Welfare Act of 1978's placement preferences – which disfavor non-Indian adoptive families in child-placement proceedings involving an "Indian child" and thereby disadvantaging those children – discriminate on the basis of race; and (2) whether the ICWA's placement preferences exceed Congress's Article 1 authority by invading the arena of child placement by invading the area of child placement – the "virtual exclusive province of the states," and by commandeering of state courts and state

14

agencies to carry out a federal child placement program.
2021 WL 4116999.

The Order granting certiorari is found at 142 S.Ct. 1205 (2022).  Oral argument occurred November 8, 2022.  The opinion was filed on June 15, 2023.

The much anticipated ruling did not reach the equal protections issues raised.  For a lack of standing did the Court defer for another day.  Slip Op. at pp. 32-34.

Justice Kavanaugh's concurring opinion recognized the issue.  "I write separately to emphasize that the Court does not address or decide the equal protection issue that can arise when the Indian Child Welfare Act is applied in individual foster care or adopting proceedings.  Slip Op. 1.  "So the equal protections issue remains undecided."  Id.

He continued.  "In my view, the equal protections issue is serious.  Under the Act, a child in foster care or adopting proceedings may in some cases be denied a particular placement because of the child's race – even if the placement is otherwise determined to be in the child's best interests."  Slip Op. 2.  "A prospective foster or adoptive parent may in some cases be denied the opportunity to foster or adopt a child because of the prospective parent's race.  Those scenarios

raise significant questions under bedrock equal protection principles and this Court's precedents." Id.

Justice Kavanaugh signaled that "Courts, including ultimately this Court, will be able to address the equal protection issue when it is properly raised by a plaintiff with standing . . ." Id.

The previous distinction the cases make when discussing Indian equal protection claims – between the unique privileges of tribal enrollment when compared merely to race – see e.g., United States v. Antelope, 430 U.S. 641, 645-47 (1977); Cavanaugh, 643 F.3d at 605-06 – was always a bit circular. For to be a member of the Tribe, the individual has to have Indian blood. To have Indian blood from a Red Lake parent confers Tribal membership. But to hold an Indian's race has nothing to do with equal protection, because it instead reflects "the fulfillment of Congress's unique obligation toward Indians," and the "special treatment" received under the law, Morton v. Mancari, 417 U.S. 535, 554-555 (1974), dissipated with the Castro-Huerta opinion granting state and federal jurisdiction for authorities to place Indians in prison, thus removing tribal sovereignty from the analysis, at least in the Tulsa area.

This Court's opposing viewpoint, set out in the Lussier Report and Recommendation at p. 25, relied extensively on Morton v. Mancari, 417 U.S. 535,

551-52 (1974); accord United States v. Stately, 19-342 (ECT/LIB) Opinion and

Order, at p. 7; Docket Entry 161 (recognizing the sovereign authority of tribes, and

rejecting for that reason constitutional claims of equal protection).

Mancari was, as expected, cited extensively in the Brackeen briefs, pro and

con.  The notion that Reservation is, by statute or history, deserving of special

treatment, Mancari, 417 U.S. at 552, has been undercut.  Justice Kavanaugh was

clear in Castro-Huerta.  The "exercise of state jurisdiction" does not necessarily

"infringe on tribal self-government."  Id. at 2501.  The "state has a strong

sovereign interest in ensuring public safety and criminal justice within its territory,

and in protecting all crime victims."  Id. at 2501-02.

And again, what has become a famous sentence:  "Indian country is part of a

state, not separate from a state."  Id. at 2502.

Haaland's majority emphasized that "congress's Indian affairs power 'is not

absolute.'"  Slip Op. at p. 13 (quoting Delaware Tribal Business Comm. v. Weeks,

430 U.S. 73, 84 (1977).

Our own claim is just as palpable and ripe.  In our view, the federal

government's manipulation of the Tribal Court – by having local authorities charge

the same offense the FBI is investigating and which will be indicted, then

warehousing the defendant until federal charges are filed – denies this defendant

17

equal protection of law.

Ms. Johnson's treatment in the Red Lake Tribal Court – lawyer-less advice and counsel, the absence of legitimate record made before a qualified Judge, a complete lack of speedy trial (the wait designed for advent of this federal indictment) – was accomplished with acquiescence of the United States.

Had Ms. Johnson been white and had she committed the offense on the Red Lake Reservation, the DOJ would have arrested her, a complaint immediately filed, with an Indictment handed down thirty days later.

Thus we have two classes of defendants. The first class features the Indian, the second a non-Indian. For the same federal offense, the first class goes to Tribal Court, at least initially. The second class is brought to this Court. The first is treated with abject neglect, not provided a lawyer and warehoused. The other is assured immediate due process.

Similar protections were available had Ms. Johnson been charged in Beltrami County state court. Ms. Johnson would have had the right of immediate presentment and the appointment of a qualified, licensed lawyer to represent her interests. See Rules 5.01 and 8.01 (presentment), Rule 5.04. (Mandating timely presentment and immediate appointment of counsel upon appearance), and Minn. Stat. 488A.021 (requiring a Minnesota state court judge to be "admitted and

qualified to practice . . .".

The result of what Ms. Johnson allegedly did, and her incarceration in Red Lake, whether on the Reservation or outside of it, would not have happened to a white defendant.

**F. <u>The Right to Speedy Trial has been denied</u>**

The Indian Civil Rights Act assures Ms. Johnson, while in Tribal custody, "the right to a speed and public trial."  25 U.S.C. 1302(6).  This Act doesn't speak to all too common suspension of time caused by the prosecution's empty motion for discovery.  See our Docket Entry 31; <u>United States v. McGhee</u>, 532 F.3d 733 (8th Cir. 2008)(holding the Government's discovery motion, until decided, suspended the speedy trial clock).

Ms. Johnson was arrested on May 2, 2022, and spent six months in the Red Lake jail without trial.  The reason she spent all that time there without a trial was because of the Government's intention, in our view, to eventually indict her, and the desire not to have a trial record for discovery purposes.  By holding the federal charges in abeyance, the Government made sure the Speedy Trial Act is not implicated here.  The clock of that statute starts to tick when the Indictment is filed.  18 U.S.C. 3161(a).

Our claim is premised on the Indian Civil Rights Act and the Sixth

Amendment, which speak to the same right.  Under Sixth Amendment jurisprudence the factors to consider are "(1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of that right; and (4) prejudice."  United States v. Walker, 840 F.3d 477, 485 (8th Cir. 2016)(citing Barker v. Wingo, 407 U.S. 514, 530 (1972)).

Applying those factors, we're running into one year from the time of her initial arrest, a period of time considered to be a presumptive delay.  United States v. Titlbach, 339 F.3d 692, 699 (8th Cir. 2003).  The reason for the delay, the second factor, is, as noted, the Government's desire to manipulate the Tribal Court so as to warehouse Ms. Johnson pending a formal charging decision.  For this factor the question is whether the Government is "more to blame" than the defendant. United States v. Rodriguez-Valencia, 753 F.3d 801, 806 (8th Cir. 2014), and the Government surely is.  The third factor is her assertion of that right, hence this motion.  Her lay advocate will testify at the motion hearing as to this issue.

And fourth, the prejudice is in holding a woman suffering from the illness of cancer in the Red Lake jail without adequate treatment while the Government dallied.  Our claim is just about the "ennui of waiting," a feeling shared by most defendants.  Walker, 840 F.3d at 486.  Had she been released pending trial, or held for a far shorter period, our claim would be for naught.  See United States v.

Weaver, 906 F.2d 1247, 1251 (8th Cir. 1990).  Instead she was just held when she should not have been.  For this federal case, her release was immediately granted.

We request the opportunity to file further briefing after the motion hearing concludes.

Dated: June 20, 2023                   Respectfully submitted,

                                       */s/ Paul Engh*
                                       PAUL ENGH, Lic. 134685
                                       150 South Fifth Street, Suite 2860
                                       Minneapolis, MN 55402
                                       612.252.1100
                                       engh4@aol.com

                                       Lawyer for Ms. Johnson