UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

        Plaintiff,

v.

TRINA MAE JOHNSON,

        Defendant.

Case No. 23-cr-23 (KMM/LIB)

**ORDER AND
REPORT AND RECOMMENDATION**

---

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon the parties' various Motions for the discovery and production of evidence, [Docket Nos. 31, 104, 105, 107, 108, 109], upon Defendant Trina Mae Johnson's ("Defendant") Motion to Dismiss, [Docket No. 103], Motion to Strike Surplusage, [Docket No. 106], Motion to Suppress Statements, [Docket No. 110], and Motion to Suppress Search and Seizure, [Docket No. 111]. The Court held a Motions Hearing on September 7, 2023, regarding the parties' pretrial motions.

Upon the request of the parties, time was allowed for supplemental Memorandums regarding Defendant's Motion to Dismiss, [Docket No. 103], Motion to Strike Surplusage, [Docket No. 106], Motion to Suppress Statements, [Docket No. 111], and Motion to Suppress Search and Seizures, [Docket No. 111], to be filed by Defendant, [Docket No. 180], and the Government, [Docket No. 185].

The Government's Motion for Discovery, [Docket No. 31], is **GRANTED**. Defendant's Motion for Discovery and Inspection, [Docket No. 104], is **GRANTED** in part and **DENIED** in part. Defendant's Pretrial Motion to Compel Disclosure of Evidence Favorable to the Defendant, [Docket No. 105]; Defendant's Pretrial Motion for Disclosure of 404(b) Evidence, [Docket No.

107]; and Defendant's Pretrial Motion to Retain Rough Notes and Evidence, [Docket No. 109], are **GRANTED**. Defendant's Motion for Pretrial Disclosure of Jencks Act Material, [Docket No. 108], is **DENIED**.

Further, it is recommended that Defendant's Motion to Dismiss, [Docket No. 105]; Defendant's Motion to Strike Surplusage, [Docket No. 106], Defendant's Motion to Suppress Statements, [Docket No. 110], and Defendant's Motion to Suppress Searches and Seizures, [Docket No. 111], be **DENIED**.

## I.    Background

Defendant is charged with one (1) count of Child Abuse by Torture in violation of 18 U.S.C. §§ 1151, 1153, and Minnesota Statute § 609.3775; one (1) count of Child Neglect in violation of 18 U.S.C. §§ 1151, 1153, and Minnesota Statute §§ 609.05 and 609.378 subdiv. 1(a)(1); one (1) count of Child Endangerment in violation of 18 U.S.C. §§ 1151, 1153, and Minnesota Statutes §§ 609.05 and 609.378 subdiv. 1(b)(1); and one (1) count of Assault on a Minor with a Dangerous Weapon in violation of 18 U.S.C. §§ 113(a)(3), 1151, 1153(a), and 3559(f)(3). (Indictment [Docket No. 1]).

## II.    Statement of Facts[1]

FBI Special Agent Ryan Nilson testified that on May 2, 2022, he received notice of an alleged crime. (Tr. 105).[2] This notice came to SA Nilson's attention after Minor Victim 1 arrived at a youth shelter in Bemidji with injuries consistent with severe abuse. (Tr. 51-53, 81). The child was brought to Sanford Medical Center for evaluation where it became apparent that the child was starved and had numerous wounds and burns.  (Tr. 81-82). Thereafter, SA Nilson reviewed Minor

---

[1] The facts contained in this section are derived from the parties' testimony and exhibits presented during the motion hearing for this case.

[2] Throughout this Order and Report and Recommendation, the Court refers to the sealed transcript of the September 7, 2023, Motions Hearing by the abbreviation "Tr." (Transcript [Docket No. 173]).

Victim 1's medical information, as well as, the victim's first forensic interview concluded on the morning of May 3, 2022. (Tr. 26, 53). That same afternoon, on May 3, 2022, SA Nilson obtained the victim's foster mother's (Defendant's) telephone number and called her. (Tr. 53). SA Nilson asked if Defendant would be willing to come to the FBI office for a voluntary interview. (Tr. 53-54). Defendant agreed and arrived at the FBI interview room before SA Nilson and Criminal Investigator Alea Richardson of the Red Lake Tribal Police. (Tr. 54). Tribal Police were present because both Minor Victim 1 and Defendant are Red Lake tribe members and their home during time of the alleged abuse was on the Red Lake Reservation. SA Nilson stated that it is common for the FBI to coordinate with Tribal Investigators who have concurrent jurisdiction. (Tr. 55-56, 70).

This interview of Defendant took place in what SA Nilson described as a "soft interview room," more akin to a "living room," than a classic suspect interrogation room, and it was furnished with two chairs, a lamp, and a table. (Tr. 54). Both Officers wore plain clothes and had their service weapons holstered. (Tr. 56). The interview was audio recorded and later transcribed. (Gov't's Ex. 1, 2).

At the start of the interview, SA Nilson advised Defendant that he wanted to talk about Minor Victim 1 and told the Defendant "You're not under arrest. Or anything like that k [sic], we are looking into a couple things but … you're free to leave at any point . . . ." (Gov't's Ex. 1 at 0:00:00-0:03:10; Gov't's Ex. 2 at 3). Defendant acknowledged this and mentioned that her boyfriend was waiting in the car. Id. SA Nilson did not read Defendant her Miranda rights during this conversation. (Tr. 57).

The interview lasted roughly two hours, throughout which, Defendant never requested to leave. (Tr. 58). SA Nilson testified that he never threatened Defendant, made any promises to her,

3

raised his voice, or brandished his weapon. Id. SA Nilson further testified that Defendant was in her late 40s, appeared of average intelligence, and presumably had some exposure to the legal system since she was a licensed foster care provider. (Tr. 59). Throughout the conversation, despite making several potentially incriminating statements about her role in the suspected abuse of Minor Victim 1, Defendant never expressed a desire to stop the interview or to leave. (Tr. 58).

As the interview was ending, SA Nilson told Defendant that he would like to go to her home and take some photos—to which Defendant consented. (Tr. 60; Gov't Ex. 1 2:04:24-2:05:59; Gov't Ex. 2 95-96). Right after this, Defendant placed a phone call to Bertram Lussier, Defendant's boyfriend, to discuss whether he would come to the FBI office to be interviewed as well. (Tr. 61). During this phone conversation, Defendant could be heard telling Mr. Lussier: "just please be honest because I don't wan[t] [to] be in any more trouble than I am . . . we're not under arrest or anything just come talk to him please." (Gov't Ex. 1 2:29:00-2:29:57; Gov't Ex. 2 110-113).

SA Nilson then asked Defendant if she would be comfortable riding to her home with him in his vehicle, to which she responded, "Sure." (Gov. Ex. 2 at 111; Tr. 63-64). During the drive to Defendant's residence, which took approximately 40-45 minutes, SA Nilson testified that Defendant made additional unprompted (unrecorded) statements during the car ride which SA Nilson subsequently memorized in a written report. (Tr. 63-64).

After arriving at the Defendant's residence, SA Nilson went over a consent to search form (Gov't Ex. 4) with her while standing outside the home. (Tr. 64; Gov't Ex. 3 0:00:00-0:03:45). SA Nilson read the consent form to Defendant and told her that she had the right to refuse consent. (Tr. 65; Gov't Ex. 3 0:02:00). The Defendant signed the form.[3]

---

[3] SA Nilson noted that he had not yet made a decision about whether to arrest Ms. Johnson since it was procedure to make such an arrest only after consultation with the U.S. Attorney's Office or the Special Agent in Charge. (Tr. 62).

SA Nilson did a walkthrough of the home without Defendant, taking some photos, and then went through the house again with Defendant. (Tr. 66-67). Defendant pointed out locations of items relevant to the alleged abuse and additional photographs were taken. Id. At no point did Defendant withdraw her consent to the search. (Tr. 67). Inside the house, in the victim's bedroom, there were holes through the wall which Defendant said was from her smashing Minor Victim 1's head through the drywall. (Tr. 67). Tribal police, including Alea Richardson, were also present throughout the search of the home. (Tr. 68).

After the search was concluded, the Red Lake Tribal Police determined to arrest Defendant on tribal child abuse charges. (Tr. 68). SA Nilson did not direct the tribal officers to arrest the Defendant. (Tr. 69). The Red Lake Tribal Police took Defendant to the Red Lake jail. (See Tr. 70).

After Defendant was arrested by Tribal Police, SA Nilson spoke with the FBI Behavioral Analysis Unit on May 5, 2022. (Tr. 84-85). The Behavioral Analysis Unit provided SA Nilson with information on investigative strategies concerning interfamilial child torture, as well as, a checklist of common elements of child torture. (Tr. 84). On May 5, 2023, SA Nilson, accompanied by Tribal Investigator Alea Richardson again, went to the Red Lake Jail to interview Defendant again. (Tr. 71). Before the interview started at the jail, SA Nilson took custody of Defendant's cell phone which was being held by the jail since her intake. (Tr. 74-75). Before the interview started, Defendant was read her Miranda rights by SA Nilson, and Defendant read out loud a portion of the Advice of Rights form that confirmed her understanding of her rights and willingness to answer questions without a lawyer present. (Gov't's Ex. 5 0:03:15-0:05:40). In addition, SA Nilson reminded Defendant that by signing the form, she was not binding herself to a contract that forced her to talk to law enforcement; she was simply memorializing her understanding of her rights. (Gov't's Ex. 6 at p. 6).

During the interview, Defendant told SA Nilson that there may be relevant items on her cell phone such as images reflecting the abuse, as well as, online searches of ways to cover up the same. (Tr. 75).[4] Although Defendant agreed to look through the phone with SA Nilson, but she was initially hesitant to grant permission due to being embarrassed about pornographic material on her cell phone; however, she eventually acquiesced after she was informed that SA Nilson would instead seek a warrant to search the cell phone. (Gov't's Ex. 5 at 0:53:45-0:58:35; Tr. 76). Defendant said that she did not "want the warrant thing" and that she might as well consent to "save[] a whole lot of paperwork." (Gov't's Ex. 6 at 77). Nonetheless, despite the Defendant's verbal consent, SA Nilson later applied for two federal warrants to search the cell phone, as well as Defendant's Facebook account. (Gov't's Ex. 9; Gov't's Ex 10).

On May 6, 2022, Defendant made her first appearance in Red Lake Tribal Court and was ordered to be detained pending trial. (Def. Ex. 11 at 34). During her pretrial detention, Defendant's tribal lay advocate,[5] Clayton Van Wert, made several motions for Defendant's pretrial release based on her health since she was entering the radiation phase of cancer treatment; the tribal court eventually granted Defendant pretrial release on October 19, 2022. (Def. Ex. 11 at 1, 28; Tr. 41-42).

Defendant was Federally indicted on January 25, 2023, on charges of child torture, abuse, and neglect. (Indictment [Docket No. 1]).

---

[4] Defendant told law enforcement she recorded a family member hitting Minor Victim 1 with her cell phone. (Gov't's Ex. 5 0:23:15).  In addition, Defendant told law enforcement that she took pictures of the scars on Minor Victim 1 and researched how to cover up scarring. (Gov't's Ex. 5 0:24:25, 0:05:15).
[5] In the Red Lake Tribal Court, tribal advocates do not need to be bar-licensed nor attend law school. (Tr. 23).

### III.    Government's Motion for Discovery. [Docket No. 31].

The Government seeks discovery pursuant to Rules 16(b), 12.1, 12.2, 12.3, and 26.2 of the Federal Rules of Criminal Procedure, as well as, Rules 702, 703, and 705 of the Federal Rules of Evidence.  (See Gov't's Mot. for Discovery [Docket No. 31]).

### A.  Inspection and Copying Pursuant to Rule 16(b)

### 1.  Documents and Tangible Objects

The Government requests that the Court order Defendant to permit inspection and copying of all books, papers, documents, photographs, tangible objects, or copies or portions thereof, which are within the possession, custody, or control of Defendant and which Defendant intends to introduce as evidence in his case-in-chief at trial.

Defendant did not object to the request. The motion is **GRANTED**, and Defendant shall disclose any such responsive materials no later than fourteen (14) calendar days before trial.

### 2.  Reports of Examinations and Tests

The Government further requests all results and reports of physical or mental examinations and of scientific tests or experiments made in connection with the above-captioned matter, or copies thereof, within the possession or control of Defendant, which Defendant intends to introduce as evidence in his case-in-chief at trial or which were prepared by a witness whom Defendant intends to call at trial.

Defendant did not object to the request. The motion is **GRANTED**, and Defendant shall disclose any such responsive materials no later than fourteen (14) calendar days before trial.

### 3.  Expert Testimony

The Government also seeks a written summary of expert testimony Defendant intends to use under Rules 702, 703, and 705 of the Federal Rules of Evidence as evidence at trial. The

Government asserts that the summary must describe the opinions of the expert witnesses, the basis and reasons thereof, and the witnesses' qualifications. The Government requests that such expert disclosures for both parties be made thirty (30) days before trial, with rebuttal expert reports produced no later than ten (10) days before trial.

The Government's request for an Order directing Defendant to disclose a written summary of expert testimony Defendant intends to use as evidence at trial is, however, partially moot. In compliance with Federal Rule of Criminal Procedure 16(a)(1)(G), the Court previously issued an Order, [Docket No. 51], directing the parties to disclose the identity of any case-in-chief expert witness and make those expert disclosures required by Federal Rule of Criminal Procedure 16 no later than twenty-eight (28) calendar days before trial, and rebuttal expert disclosures, which shall be disclosed no later than fourteen (14) days before trial.

Therefore, to the extent the Government's Motion for Discovery, [Docket No. 31], seeks an Order of this Court requiring Defendant to disclose a written summary of rebuttal expert testimony Defendant intends to use under Rule 702, 703, and 705 of the Federal Rules of Evidence as evidence at trial, the Government's Motion for Discovery, [Docket No. 31], is **GRANTED**.

### B.    Notice of Alibi Defense

Pursuant to Federal Rule of Criminal Procedure 12.1, the Government seeks an Order from the Court requiring Defendant, if he intends to claim alibi as a defense, to state the specific place or places at which Defendant claims to have been at the time of the alleged offenses in the above-captioned matter and the names and addresses of the witnesses upon whom Defendant intends to rely on to establish such alibi.

Defendant did not object to this request. The motion is **GRANTED**, and Defendant shall give notice of same pursuant to Rule 12.1 as soon as practicable and in no event later than twenty-one (21) calendar days before trial.

### C.    Notice of Insanity/Mental Illness Defense

In addition, pursuant to Federal Rule of Criminal Procedure 12.2, the Government requests the Court to order Defendant, if he intends to rely upon the defense of insanity or introduce expert testimony relating to a mental disease or defect or any other mental condition of Defendant relevant to the issue of guilt, to provide the Government notice of such defense.

Defendant did not object to this request. The motion is **GRANTED**, and Defendant shall give notice of same pursuant to Rule 12.2 as soon as practicable and in no event later than twenty-one (21) calendar days before trial.

### D.    Notice of Public Authority

Pursuant to Federal Rule of Criminal Procedure 12.3, the Government seeks an order from the Court requiring Defendant, if he intends to rely upon the defense of actual or believed exercise of public authority on behalf of a law enforcement agency or federal intelligence agency at the time of the offense, to notify the Government and the Court no later than the date of the first hearing on pretrial motions.

Defendant did not object to this request. The motion is **GRANTED**, and Defendant shall give notice of same pursuant to Federal Rule of Criminal Procedure 12.3 as soon as practicable and in no event later than twenty-one (21) calendar days before trial.

### E.  Witness Statements

The Government seeks all statements within Defendant's possession or control of any witness that Defendant intends to call in connection with a suppression hearing, detention hearing, trial, or sentencing.

Defendant did not object to this request.  The motion is **GRANTED**.  To the extent Defendant has statements in her possession or control of any witness that she intends to call to testify in connection with a suppression hearing, detention hearing, trial, or sentencing, Defendant shall disclose such statements to the Government no later than three (3) calendar days before such witness is called to testify.

### IV.    Defendant's Motion for Discovery and Inspection. [Docket No. 104].

Defendant requests from the Court an Order pursuant to Rule 16(a) of the Federal Rules of Criminal Procedure to require the Government to disclose any written, recorded, or oral statements made by Defendant or copies thereof in the possession, custody, or control of the Government; the substance of any oral statements made by Defendant whether before or after arrest, which the Government intends to offer in evidence at the trial. (Def.'s Mot. for Discovery and Inspection [Docket No. 104]). Defendant also seeks a copy of her criminal record if such a record exists and is within the possession or control of the Government. (Id.)

Furthermore, Defendant also requests permission to inspect and/or copy books, papers, documents, photographs, and tangible objects in the possession, custody, or control of the Government that are material to the preparation of the defense or are intended for use by the Government as evidence in his case-in-chief at the trial or were obtained from or belonged to Defendant. (Id.). Specifically, Defendant requests medical records of the alleged victim and her own DNA testing results, including all protocols and forensic data showing the relevant

comparisons between known and unknown samples of DNA. (Id.) Finally, Defendant requests for disclosure of expert testimony.

The Government does not object to the schedule already set forth in the Court Scheduling Order: mutual expert disclosures twenty-eight (28) days prior to trial, and rebuttal expert disclosures fourteen (14) days prior to trial. (Amend. Scheduling Order [Docket No. 51]). The Government recognizes its disclosure obligations and states it will continue to abide by disclosure obligations. (Gov't's Omnibus Response to Defendants' Pretrial Mots. [Docket No. 145] at p. 2). However, the Government objects to any discovery order which exceeds the requirements of Rule 16. (Id.).

It is well established that "[c]riminal defendants do not have a general constitutional right to discovery." United States v. Johnson, 228 F.3d 920, 924 (8th Cir. 2000) (citing Weatherford v. Bursey, 429 U.S. 545, 559, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977)). "In most circumstances, then, a defendant must point to a statute, rule of criminal procedure, or other entitlement to obtain discovery from the government." Id.

Here, the Federal Rule of Criminal Procedure requires the Government to disclose, among other things, relevant written or recorded statements or confessions made by Defendant; relevant results or reports of physical or mental examinations; and documents within the Government's possession, custody, or control that are material to preparing the defense, will be used by the Government in its case-in-chief, or documents obtained from or belonging to Defendant. See Fed. R. Crim. P. 16(a).

Accordingly, Defendant's Motion for Discovery and Inspection, [Docket No. 104], is **GRANTED** in part as to any subsequently acquired materials or information which are specifically responsive to Rule 16(a)(1)(A)-16(a)(1)(E), which shall be disclosed to the Defense as soon as

said responsive materials are discovered by the Government and, in any event, by no later than fourteen (14) days before trial. However, Defendant's Motion for Discovery and Inspection, [Docket No. 104], is **DENIED** in part to the extent it seeks discovery beyond that which is required by Rule 16.

## V.    Defendant's Pretrial Motion to Compel Disclosure of Evidence Favorable to the Defendant.  [Docket No. 105].

Defendant seeks disclosure of evidence favorable to her which would fall within the authority of <u>Brady v. Maryland,</u> 373 U.S. 83 (1963); <u>Giglio v. United States,</u> 405 U.S. 150 (1972); and their progeny. (Def.'s Pretrial Mot. to Compel Disclosure of Evidence Favorable to the Defendant [Docket No. 105]).

Defendant seeks, among other things, (1) Evidence of promises made to any witness in exchange for their corporation;[6] (2) the BCA and FBI criminal history of each witness, (3) Relatedly, evidence of prior, admissible convictions of the witnesses who will be testifying at trial, including any informants; (4) any immunity agreements offered to Government witnesses in exchange for his or her cooperation or testimony under both state and federal statutes; (5) evidence of prior inconsistent statements of witnesses, particularly concerning their ability to view and remember the alleged incidents of trauma inflicted upon the alleged victim; (6) any evidence that the injuries suffered by the alleged victim named in the Indictment have healed, or appear today to be far less severe than the initial photographs would indicate;[7] and (7) evidence that the injuries

---

[6] Defendant asserts that it appears from discovery, that several co-defendants have expressed an interest in cooperating with the investigation and/or testifying at the forth coming trial. Defendant believes these exchanges were informal oral exchanges between witnesses and an FBI agent. (Defendant's Motion to Compel Disclosure of Evidence Favorable to the Defendant [Docket No. 105] at p. 2).

[7] Defendant asserts that this information is critical to sentencing guideline calculations and that Defendant believes the "healing capacity" of the alleged victim is an important factor since the phrase "serious bodily injury" in 18 U.S.C. 113(b)(2) references 18 U.S.C. 1365(h)(3) which defines such injury as one that involves "(A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty." (Defendant's Motion to Compel Disclosure of Evidence Favorable to the Defendant [Docket No. 105] at p. 3).

to the alleged victim were inflicted before their foster care placement with Defendant and her family.

The Government, acknowledging its duty to disclose responsive materials and information, represented that it has previously disclosed evidence favorable to the Defendant within its possession and will continue to comply with its obligations under Brady, and its progeny.  (Gov't's Omnibus Response to Defendants' Pretrial Mots. [Docket No. 145] at p. 3).

The Government objects to Defendant's Motion to the extent she seeks materials beyond the requirements of Brady, Giglio, and their progeny. (Id.).  Specifically, the Government has represented that they have produced a significant number of medical records in this case and will continue to supplement those productions with any additional medical information it intends to offer at trial. (Gov.'s Omnibus Response to Defendants' Pretrial Motions [Docket No. 145] at p. 3).

Defendant's Pretrial Motion to Compel Disclosure of Evidence Favorable to the Defendant, [Docket No. 27], is **GRANTED**.  The Government will disclose any and all remaining and/or subsequently discovered, obtained, or obtainable material responsive to Brady to the Defense as soon as said responsive materials are known to the Government.[8]  As for materials that are responsive to Giglio and related to the impeachment of the Government's witnesses to be called

---

[8] Defendant's Motion purportedly seeks to list various items that Defendant believes are categorized as responsive materials under Brady, and Defendant asks the court to order the disclosure of these specific materials– ostensibly after making a finding that said materials are responsive to Brady. To the extent Defendant makes such a request, that request is denied. The Court notes that, in Kyles v. Whitley, 514 U.S. 419 (1995), the United States Supreme Court "emphasized the discretion of the *prosecutor*, not the trial judge, in deciding what evidence is producible under Brady." United States v. Garrett, 238 F.3d 293, 304 n.4 (5th Cir. 2000) (emphasis added). The Sixth Circuit has also explained that "while the Brady rule imposes a general obligation upon the government to disclose evidence that is favorable to the accused and material to guilt or punishment, the government typically is the sole judge of what evidence in its possession is subject to disclosure." United States v. Clark, 957 F.2d 248, 251 (6th Cir. 1992). That being said, "[i]f [the Government] fails to comply adequately with a discovery order requiring it to disclose Brady material, it acts at its own peril." Id.  Accordingly, the Court encourages the Government to carefully evaluate the materials in its possession in light of a liberal understanding of its Brady obligations.

at trial, the Government shall disclose responsive materials no later than seven (7) days before (a) trial or (b) when the presiding trial judge requires disclosure of the Government's witness list, whichever is earlier.[9]

## VI.    Defendant's Pretrial Motion for Disclosure of 404(b) Evidence.  [Docket No. 107].

Defendant seeks immediate disclosure of any "bad act" or "similar course of conduct" evidence that the Government intends to offer at trial pursuant to Federal Rule of Evidence 404(b). (See Def.'s Pretrial Mot. for Disclosure of 404(b) Evidence [Docket No. 107]).

In its written response, the Government acknowledged its obligation to comply with Rule 404(b), and it represented that it will continue to comply with its obligations. (Gov.'s Omnibus Response to Defendants' Pretrial Motions [Docket No. 145] at p. 8).  The Government suggested that disclosures regarding Rule 404(b) evidence be made no later than two (2) weeks before trial. (Id.).

In relevant part, Rule 404(b)(3) provides that the Government must "provide reasonable notice of any" Rule 404(b) "evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it."  Fed. R. Evid. 404(b)(3)(A).  In that notice, the Government must also "articulate . . . the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose."  Fed. R. Evid. 404(b)(3)(B).

Defendant's Pretrial Motion for Disclosure of 404(b) Evidence, [Docket No. 26], is **GRANTED**. The Court orders the Government to disclose to the Defense as soon as practicable, and in no event later than two (2) weeks before trial, formal notice of any specific 404(b) evidence it intends to offer, as well as the purpose for which it intends to offer it into evidence at trial.[10]

---

[9] The Government's disclosure of materials responsive to Giglio and related to the impeachment of the Government's witnesses to be called at trial shall include the criminal history, if any, for each trial witness.
[10] Federal Rule of Evidence 404(b) does not extend to evidence of acts which are "intrinsic" to the charged offense. United States v. Adediran, 26 F.3d 61, 63 (8th Cir. 1994) (standards applicable to evidence considered under Rule

**VII.    Defendant's Motion for Pretrial Disclosure of Jencks Act Material. [Docket No. 108].**

Defendant moves the Court for an Order requiring the Government to disclose Jencks Act materials at least two (2) weeks before trial.  (Def.'s Mot. for Pretrial Disclosure of Jencks Act Material, [Docket No. 108]).

The Government objects to Defendant's motion, arguing that it cannot be <u>required</u> to make mandatory pretrial disclosure of Jencks Act materials.  (Gov.'s Omnibus Response to Defendants' Pretrial Motions [Docket No. 145] at pp. 8-9).

The Court recognizes the practical effect that disclosing Jencks Act materials only after a witness has actually testified in the Government's case-in-chief creates the prospect for unnecessary continuances and delays in the trial while the Defense is permitted a reasonable time to review the late disclosures.  However, Defendant provides no citation to any authority that would allow the Court to <u>require</u> early disclosure of Jencks Act material.  Generally, the case law provides that the Court may <u>not</u> require the Government to make mandatory early disclosure of Jencks Act material.  <u>See, e.g.</u>, <u>United States v. Alexander</u>, 736 F. Supp. 968, 981 (D. Minn. 1990); <u>United States v. White</u>, 750 F.2d 726, 727 (8th Cir. 1984); <u>United States v. Wilson</u>, 102 F.3d 968, 971–72 (8th Cir. 1996).

Accordingly, Defendant's Motion for Early Disclosure of Jencks Act Materials, [Docket No. 29], is **DENIED**.[11]

**VIII.   Defendant's Pretrial Motion for Government Agents to Retain Rough Notes and Evidence. [Docket No. 109].**

---

404(b) do not apply to such "inextricably intertwined" evidence); <u>see</u> <u>United States v. Williams</u>, 900 F.2d 823 (5th Cir. 1990).

[11] However, the Government <u>voluntarily</u> agreed to provide all Jencks Act material to the Defense by no later than three (3) business days before trial. (Gov.'s Omnibus Response to Defendants' Pretrial Motions [Docket No. 145] at pp. 8-9). The Court encourages such voluntary agreements.

Defendant requests an Order from the Court requiring any law enforcement agent, including any confidential informant, to retain and preserve all rough notes taken as part of their investigations, whether or not the contents of such rough notes are incorporated in official records. (See Def.'s Pretrial Mot. for Gov. Agents to Retain Rough Notes and Evidence, [Docket No. 109]). In addition, Defendant reeks the retention of evidence that is directly relevant to issues relating to Defendant as well. Id.

The Government does not object to Defendant's request to retain rough notes and evidence. (Gov.'s Omnibus Response to Defendants' Pretrial Motions [Docket No. 145] at pp. 9-10).

Defendant's motion is **GRANTED** regarding rough notes as to retention only at this time. If Defendant seeks production or disclosure of rough notes, she will need to bring a separate motion for such production. Defendant's motion is also granted as to evidence seized in the course of the investigation. Evidence seized in the course of investigation shall be produced as required by the Federal Rules of Criminal Procedure or other Order of this Court.

## IX.    Defendant's Motion to Strike Surplusage. [Docket No. 106].

Defendant moves the Court for an Order striking from the Indictment unnecessary and prejudicial surplusage pursuant to Federal Rule of Criminal Procedure 7(d). Defendant claims that the description of the minor Victim's torture in all of its permutations set forth in Paragraph 4 of the Indictment is not an element of the offense and is inflammatory and prejudicial. In its relevant portion, Paragraph 4 of the Indictment, [Docket No. 1], states that Defendant and her co-defendants "committed, caused, and/or permitted severe and pervasive abuse towards Minor Victim 1, including but not limited to" starvation, deprivation of sleep, assaults, threats, withholding medical care, and social isolation which caused "Minor Victim 1 [to suffer] serious and substantial harm to [their] physical, mental, and emotional health."

16

The Government argues that in a factual and legally complex case such as this, background information can be particularly helpful for contextualizing the criminal conduct alleged, and thus, the description should not be stricken. The Government further asserts that the language of the indictment relates to evidence of a pattern and scheme amongst the Defendants to abuse, neglect, and injury the minor victim, and that such evidence is relevant and necessary to explain: the nature, manner, and means of the abuse; the relationships between the various defendants and the minor victim; and the conduct that particular defendants knew about, even if they did not commit the act solely on their own. (Gov.'s Omnibus Response to Defendants' Pretrial Motions [Docket No. 145] at p. 6).

Federal Rule of Criminal Procedure 7(d) allows a district court to strike surplusage from the indictment. "A motion to strike surplusage from an indictment … should be granted only where it is clear that the allegations contained therein are not relevant to the charge made or contain inflammatory and prejudicial matter." United States v. Michel-Galaviz, 415 F.3d 946, 947 (8th Cir. 2005) (quoting Dranow v. United States, 307 F.2d 545, 558 (8th Cir. 1962)) (emphasis added). "Motions to strike surplusage are not lightly granted and require the defendant to meet a significant burden of proof." United States v. Augustine Medical, Inc., 2004 WL 502183, at *4 (D. Minn. 2004). Furthermore, in factually and legally complex cases, background information is particularly helpful for contextualizing the criminal conduct alleged. United States v. Watt, 911 F. Supp. 538, 554 (D.D.C. 1995).

The Indictment charges Defendant with directing the systematic torture, endangerment, neglect, and abuse of a minor who was in Defendant's custody under 18 U.S.C. §§ 113(a)(3), 1151, 1153, 1153(a), 3559(f)(3), and Minnesota Statutes §§ 609.05, 609.3775, and 609.378 subdivs. 1(a)(1) and 1(b)(1). (Indictment [Docket No. 1]). In addition, the Indictment alleges a Conspiracy

with other members of Defendant's household to torture, endanger, neglect, and abuse the minor victim. Id.

Accordingly, the Court finds that Defendant has not met her significant burden to show that the allegations contained in the Indictment are either irrelevant or contain the type of inflammatory and prejudicial matter that would warrant the Court to strike surplusage. Instead, the Court finds the allegations in the Indictment plainly, albeit comprehensively, describe alleged facts which are the very basis for the crimes with which the Defendant is charged. Furthermore, to the extent that the allegations in the Indictment may inflame the passions, be confusing, or potentially create a possible disjunction between what is alleged and what is proven at trial, all that can be explained to a jury by testimony or instruction.

Therefore, the undersigned recommends that Defendant's Motion to Strike Surplusage, [Docket No. 106], be **DENIED**.

## X.    Defendant's Motion to Dismiss. [Docket No. 103].

Defendant seeks an Order of this Court dismissing the Indictment underlying the present case. (Def.'s Mot. to Dismiss [Docket No. 103]). Defendant argues that due to alleged deficiencies in the handling of the Tribal charges against her in Red Lake Tribal Court, this separate Federal action should be dismissed on the grounds of a violation of equal protection. (Def.'s Memorandum in Support of Mot. to Dismiss and Suppress [Docket No. 180] at p. 11).

Defendant argues that under recent Supreme Court precedents, Indian Reservations like the Red Lake Nation are no longer sovereign, and thus, because of perceived deficiencies in the manner in which Defendant's case was handled by the Tribal Court, Defendant was unfairly denied protections which she would have been enjoyed in State or Federal court. Id. at 12. Defendant further asserts her claim that the Red Like Nation is not a true sovereign because, as the defendant

asserts, there was no boundary between Tribal and Federal law enforcement in the investigation of this case. Id.

Starting with the alleged collusion between federal and tribal authorities that potentially undermines the dual sovereignty doctrine, there is <u>no</u> evidence in the record nor any provided by Defendant that the Tribe (its law enforcement, prosecutors, or Court officials) actually operated under the direction and control of the Federal government in regard to Defendant's tribal case. While the record does support the Defendant's assertions that federal authorities were aware of a potential crime and that both Federal and Tribal law enforcement cooperated in the investigation of the alleged crimes which first led to the Defendant's arrest and tribal charging by Tribal authorities such routine cooperation does <u>not</u> establish impermissible collusion and is important to crime prevention. <u>See</u> <u>United States v. Begay</u>, No. 21-CR-119 (NEB/LIB), 2022 WL 683090, at *5 (D. Minn Mar. 8, 2022). Indeed, the Defendant's own witness, Mr. Van Wert, testified at the motions hearing that he was unaware of any actual pressure or influence brought to bear by the Federal Government on the charging and handling of Defendant's case in Tribal Court. (Tr. 44-45).

Defendant's second point regarding her assertion that recent Supreme Court precedents suggest that tribes are no longer sovereign and thus violate equal protection misreads and misapplies the current Supreme Court precedent. Nothing in <u>Oklahoma v. Castro-Huerta</u>, 142 S.Ct. 2486 (2022), diminishes the Red Lake Nation's existence as a distinct sovereign entity or the long-standing dual sovereignty doctrine. As this Court has previously made clear, the effect of <u>Castro-Huerta</u> is limited exclusively to the narrow holding and specific facts of <u>Castro-Huerta</u>—"the Federal Government and the State [of Oklahoma] have concurrent jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country," <u>Id.</u> at 2504–05, provided Congress

has not otherwise specifically precluded such state action in Indian Country; Castro-Huerta, stands only for the proposition that Congress has not limited the ability of the State of Oklahoma to prosecute non-Indians for crimes committed within Indian country in Oklahoma. See United States v. Tony Lee Lussier, 21-cr-145 (PAM/LIB) [Docket No. 93] Report and Recommendation adopted [Docket No. 96].[12]

Defendant's equal protection argument has been repeatedly rejected by the Courts. See, e.g., United States v. Sumner, No. 13-cr-71 (2) (RHK), 2013 WL 5923084, at *13 (D. Minn. Oct. 31, 2013) ("the federal courts have repeatedly held that treating Indian tribal members differently from non-Indians for incidents arising in Indian country does not violate either due process or equal protection."); United States v. Antelope, 430 U.S. 641, 646–47 (1977); United States v. Stately, No. 19-cr-342 (ECT/LIB), 2021 WL 1321269, at *15–18 (D. Minn. Jan. 11, 2021), report and recommendation adopted, 2021 WL 1187152 (D. Minn. Mar. 30, 2021); United States v. Cavanaugh, 643 F.3d 592, 605 (8th Cir. 2011). "[D]istinguishing between tribal court and state defendants is not a race-based classification." Stately, 2021 WL 1321269, at *17. Instead, it is a political status distinction "based upon 'the quasi-sovereign status of [Indian tribes] under federal law.'" Id. Thus, Defendant's equal protection claim fails without question.

As for Defendant's grievances regarding the procedures of the Tribal Court, those procedures are of a distinct sovereign entity and apply to her by virtue of Defendant's tribal membership along with the minor victim's tribal membership, and the site of the alleged criminal conduct occurring within the boundaries of the Red Lake Nation. And, for the reasons already set

---

[12] Defendant's further citation to Haaland v. Brackeen, 599 U.S. 255, 143 S.Ct. 1609 (2023), does nothing to alter either the sovereign status of the Red Lake Nation nor undermine long-established principles regarding the effect of Tribal Court proceedings on separate proceedings subsequently pursued in Federal District Court. Indeed, the singularly clear effect of Brackeen is to reaffirm the sovereign status of Indian Nations and of Congresses plenary authority over Indian Country as provided for in the United States Constitution because of tribes unique sovereign quality.

forth above, <u>any</u> alleged violations of Red Lake Tribal Court procedures raise <u>no</u> equal protection problem for the present, separate Federal Indictment.

Therefore, the undersigned recommends that Defendant's Motion to Dismiss, [Docket No. 103], be **DENIED**.

## XI.    Defendant's Motion to Suppress Statements. [Docket No. 110].

Defendant seeks an Order of this Court to suppress evidence of her separate statements made on May 3 and May 5, 2022. The first was taken at the FBI office in Bemidji, and the second at the Red Lake jail. Defendant argues that her statements made in the Bemidji FBI office should be suppressed because she was involuntarily in "de facto" custody at the time, and no <u>Miranda</u> warning was ever given. As for her statements in the Red Lake Tribal jail, Defendant argues that this statement was the product of undue delay in her presentment to a Federal Magistrate Judge.

### A. Defendant Statements Made in the May 3, 2022, Interview

Starting with the May 3, 2022, interview, the Court finds that Defendant was <u>not</u> in custody; therefore, a <u>Miranda</u> advisory was <u>not</u> required, and her statements to law enforcement that day were voluntary.

#### a.  Standard of Review

"[<u>Miranda</u>] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." <u>United States v. Chipps</u>, 410 F.3d 438, 445 (8th Cir. 2005) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). Law enforcement must provide a Miranda advisory prior to interrogation when a person has been "taken into custody or otherwise deprived of [her] freedom of action in any significant way." <u>Stansbury v. California</u>, 511 U.S. 318, 322, 114 S. Ct. 1526, 128

L. Ed. 2d 293 (1994) (quoting <u>Miranda</u>, 384 U.S. at 444). Significantly, law enforcement officers "are not required to administer Miranda warnings to everyone whom they question." <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977). "Miranda warnings are required only where there has been such a restriction on a person's freedom as to render [her] in custody." <u>Id.</u> (internal quotation omitted).

The Eighth Circuit considers six (6) factors when evaluating whether an individual is "in custody" for the purposes of Miranda:

> (1) Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

<u>United States v. Sanchez</u>, 676 F.3d 627, 630 (8th Cir. 2012) (quoting <u>United States v. Griffin</u>, 922 F.2d 1343, 1349 (8th Cir. 1990)).

"The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." <u>United States v. Axsom</u>, 289 F.3d 496, 500-01 (8th Cir. 2002). None of the six factors, however, is entirely dispositive; "[t]he analysis depends upon a review of the totality of circumstances, and '[t]he ultimate test is whether a reasonable person in that position would have felt free to end the interview.'" <u>Sanchez</u>, 676 F.3d at 630-31 (quoting <u>United States v. Aldridge</u>, 664 F.3d 705, 711 (8th Cir. 2011)). Because the ultimate custody determination is based on the totality of the circumstances, a particularly strong showing on one factor may compensate for a deficiency on another factor. <u>Griffin</u>, 922 F.2d at

1347, 1349. The key inquiry is whether there was a formal arrest or restraining of a defendant's movement to the degree associated with a formal arrest. Stansbury, 511 U.S. at 322.

"In answering this question, we look at the totality of circumstances while keeping in mind that the determination is based 'on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc) (quoting Stansbury, 511 U.S. at 322-23), cert. denied LeBrun v. United States, 543 U.S. 1145, 125 S. Ct. 1292, 161 L. Ed. 2d 105 (2005). The Court must examine "both the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation in light of whether a reasonable person in the suspect's position would have understood his situation to be one of custody." Axsom, 289 F.3d at 500 (internal quotation marks omitted).

A custodial interrogation is one that "involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [her] freedom of action in any significant way." Miranda, 384 U.S. at 444. Courts define interrogation as "express questioning or its functional equivalent," which includes "words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

**b.  Analysis**

**1. Knowledge that Encounter was Voluntary**

Looking at the Griffin factors one at a time, starting with the first factor, the Defendant was, in fact, informed that she was free to leave or decline questioning at any time. This factor weighs heavily in favor of a finding that a suspect was not in custody. Sanchez, 676 F.3d at 630-

31. The recording and testimony show that Defendant was told she was free to leave or decline questioning. Defendant even verbally told her boyfriend that she understood they were not under arrest. (Gov't Ex. 1 at 0:00:00-0:03:10; Gov't Ex. 2 at 3).

Accordingly, this factor weighs heavily in favor of finding that Defendant was not in custody during the May 3, 2022, interview.

### 2. Restraint on Freedom

Defendant also argues her restraint on Freedom during the May 3, 2022, interview was curtailed because Defendant was formally arrested by Tribal authorities sometime later at her home on the Red Lake Reservation after being brought to her home in FBI SA Nilson's car. (Def.'s Memorandum in Support of Mot. to Dismiss and Suppress [Docket No. 180] at 16). As previously discussed, the key inquiry is whether, at the time of the interview, there was a formal arrest or restraining of a defendant's movement to the degree associated with a formal arrest. Stansbury, 511 U.S. at 322.

Here, at the time of the May 3, 2022, interview, there was no formal arrest nor any physical restraint placed on Defendant to the degree that could be associated with a formal arrest. Indeed, Defendant was specifically told she could end the interview and leave at any time if she wanted. Whether or not law enforcement subjectively believed during the interview they had sufficient evidence to arrest a suspect is irrelevant to the objective inquiry of whether a defendant's movement was actually restrained by the police. See United States v. Skog, No. 18-cr-085 (WMW/HB), 2018 U.S. Dist. LEXIS 175245, 2018 WL 4938718, at *8 (D. Minn. Aug. 28, 2018) (finding that law enforcement interviewing the defendant on his front lawn weighed against finding that the interrogation of the defendant was custodial in nature).

The second <u>Griffin</u> factor, therefore, weighs against a finding of Defendant being in custody during the May 3, 2022, interview.

### 3. Initiated Contact/Voluntary Acquiescence

Law enforcement initiated the interaction with the Defendant by calling her and asking her to come voluntarily for an interview, to which Defendant agreed. (Tr. 53-54). However, after Defendant arrived at the law enforcement office on her own, and despite being told she was not required to speak to law enforcement and could leave at any time, the record shows that Defendant voluntarily participated in and continued talking to law enforcement without ever seeking to end the May 3, 2022, interview. (<u>See</u> <u>generally</u>, Gov't's Ex. 2).

Accordingly, the third <u>Griffin</u> factor also weighs against a finding that Defendant was in custody.

### 4. Strong Arm or Deceptive Tactics

Defendant appears to argue that law enforcement promised during the interview at the FBI office that she was free to leave, but this promise "was phony" since she was arrested sometime later at her home on the Red Lake Reservation by Tribal Authorities. (Def.'s Memorandum in Support of Mot. to Dismiss and Suppress [Docket No. 180] at 16). This is not the type of deceptive or strong arm tactic that would make a reasonable person believe they were in custody.

In the present case, there is <u>no</u> evidence that the officers used any strong arm tactics during the May 3, 2022, interview. Rather, the Court's review of the audio recording of the interview indicates that the officers and Defendant engaged each other in casual, conversational tones without any voices being raised, without any threats being made, nor were any weapons being brandished. (Gov't's Ex. 1). That Tribal authorities may have separately held a subjective intent to later arrest Defendant or that they may have formed that subjective intent later does not alter the

objective analysis of the totality of the circumstances during the May 3, 2022, interview of Defendant at the FBI office that a reasonable person would not have felt in custody under the same circumstances. See United States v. Ollie, 442 F.3d 1135, 1139 (8th Cir. 2006) (Holding that Law Enforcement's subjective intent to elicit a confession is not the kind of deceit which would "prevent a reasonable person from terminating the interview"); see also United States v. Laurita, 821 F.3d 1020, 1026 (8th Cir. 2016) ("[D]eception [by law enforcement] is irrelevant unless it relates to a reasonable person's perception of his freedom to depart.").

Accordingly, this Griffin factor weighs against a finding that Defendant was in custody during the May 3, 2022, interview.

### 5. Police Dominated Atmosphere

The fifth factor, which addresses whether questioning took place in a "police dominated atmosphere," weighs slightly in favor of finding that Defendant was in custody during the May 3, 2022, interview. "The question is whether the entire context of the questioning, including such considerations as place and length of the interrogation, demonstrates that the course of the [interaction] was police dominated." United States v. Griffin, 922 F.2d 1343, 1352 (8th Cir. 1990).[13] In Ollie, the suspect was questioned in a small conference room at the police station, with only one officer present. The Court found that "the interview took place in a police-dominated atmosphere and that this atmosphere would have restrained a reasonable person's movements." Ollie, 442 F.3d at 1139. The Court reasoned that "[i]nterviews taking place on the police officers' 'home turf' are more

---

[13] The length of an interview, location, and officer's demeanor all contribute to the atmosphere and can influence whether a reasonable person would believe they were free to leave. See Axsom, 289 F.3d at 502 (concluding the district court erred in finding an interview was police dominated because, although nine federal agents were present in the suspect's home where the interview took place, "only two agents conducted the interview[,]" "[c]ommunication between the agents and [the suspect] consisted of two-way questioning," and photographs of the scene "reflect[ed] a more casual scene than a police dominated, inherently coercive interrogation"); Czichray, 378 F.3d at 825, 830 (ruling a "nearly seven[-]hour[]" interview where agents arrived at the suspect's home at 6:30 a.m., demanded he answer the door, instructed the suspect to call in sick to work, and told the suspect they would "'light up his world'" if he did not cooperate was not custodial).

likely to be police-dominated." Id. However, an environment is not a "police dominated atmosphere" simply because it took place at a police station. See Oregon v. Mathiason, 429 U.S. 492, 495 (1977) ("Nor is the requirement of warning to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.").

Here, the fact that the interview took place in a "soft interview" room at the FBI's office in Bemidji with one FBI special agent and one tribal officer present may support a conclusion that the atmosphere was police dominated since law enforcement would be considered 'at home' in this location because it was an FBI office. See Sanchez, 676 F.3d at 632. However, the fact that Defendant went to the FBI office voluntarily on her own and was specifically told she could leave at any time the "police dominance" was not great.

As such, this factor weighs slightly in favor of finding that Defendant was in custody.

**6. Arrest at the End of the Encounter**

The final factor is whether the suspect was placed under arrest at the termination of the questioning. If such an arrest did occur, the factor may weigh towards a finding that Defendant was in custody, but if no arrest occurs at the termination of questioning, the factor weighs against such a finding. See Lussier, No. 19-cr-0087 (WMW/LIB), 2019 U.S. Dist. LEXIS 138348, 2019 WL 3847296, at *13.

At the conclusion of the May 3, 2022, interview by FBI SA Nilson at the Bemidji FBI office, Defendant was not arrested. Instead, Defendant agreed to be taken back to her home where she consented to a search of her house. Only after this search did the Red Lake Tribal Police, but

not the FBI, determine to arrest the Defendant. (Tr. 68). Defendant asserts that this final factor is the most important of the six Griffin factors, but she does not provide case law supporting a position that the sixth factor should be solely determinative. To the contrary, arrest at the end of questioning is not a dispositive circumstance "indicative of custody because 'custodial status depends on whether a reasonable person would feel free to leave during the interview.'" United States v. Hallmon, No. 22-CR-365 (KMM/DTS), 2023 WL 6285183, at *11 n.13 (D. Minn. Sept. 27, 2023) (quoting United States v. Treanton, 57 F.4th 638, 641 (8th Cir. 2023)) (emphasis added).

Moreover, not only was Defendant not arrested at the conclusion of the FBI interview, but Defendant clearly did not perceive herself to be under arrest during the time of the interview nor even at its conclusion because, as the interview was about to conclude, she expressed her view that she was not under arrest sua sponte to her boyfriend. (Gov't Ex. 1 2:29:00-2:29:57; Gov't Ex. 2 110-113).

While the Court finds that the Defendant was not arrested at the conclusion of the interview (which weighs against the finding of custody), the calculus of determining whether a suspect is in custody for Miranda purposes is more complex and nuanced than numerically tallying up the six Griffin factors. United States v. Flores-Sandoval, 474 F.3d 1142, 1147 (8th Cir. 2007). The Court recognizes that there was never a significant interruption of the chain of events between the end of the May 3, 2022, FBI interview in Bemidji and the Defendant's later arrest by Tribal Authorities at her home on the Red Lake Reservation, which the Court takes into account when making the determination of whether a reasonable person would have understood herself to be under arrest during the interview at issue given the totality of the circumstances.

Accordingly, based on all the circumstances and giving due weight to each of the factors under Griffin, the Court finds that a reasonable person in the Defendant's position would not

understand herself to be under arrest either during or at the conclusion of the interview at the FBI office in Bemidji.

Therefore, the undersigned recommends that Defendant's Motion to Suppress Statement, [Docket No. 110], be **DENIED** regarding the statements she made to FBI SA Nilson during her May 3, 2022, encounter with law enforcement.

### B. Defendant Statements Made in the May 5, 2022, Interview

Defendant asserts that her statements during the May 5, 2022, interview should be suppressed solely because the statement was the product of undue delay in her presentment to a U.S. Magistrate Judge under Federal Rule of Criminal Procedure 5(a) along with Title 18 U.S.C. § 3501.[14] Defendant acknowledges that the right of presentment, requiring the defendant within six hours of arrest to appear before a judicial officer pursuant to Corley v. United States, 556 U.S. 303, 316, 129 S. Ct. 1558, 173 L. Ed. 2d 443 (2009), does not extend to tribal court. United States v. Alvarez-Sanchez, 511 U.S. 350, 354, 114 S. Ct. 1599, 128 L. Ed. 2d 319 (1994).

Instead, Defendant argues that Defendant was being improperly held at the Red Lake Tribal jail in violation of 25 U.S.C. § 1302(A)(6) and (7) of the Indian Civil Rights Act and that SA Nilson took advantage of this delay by questioning the Defendant at this time. (Defendant's Motion to Suppress Statements [Docket No. 110]).

Rule 5(a)(1)(A) of the Federal Rules of Criminal Procedure provides that any "person making an arrest within the United States must take the defendant without unnecessary delay before a U.S. Magistrate Judge, or before a state or local judicial officer as Rule 5(c) provides,

---

[14] The Defendant was in Tribal custody on May 5, 2022, and she was given a Miranda advisory, which she waived, prior to any questions by law enforcement at that time. Defendant does not raise any 5th or 6th Amendment challenge to the voluntariness of her May 5, 2022, statements.

unless a statute provides otherwise." Fed. R. Crim. P. 5(a)(1)(A). Relatedly, Title 18 U.S.C. § 3501(c) states:

> In any criminal prosecution by the United States . . . , a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such a person before a magistrate judge . . . if such a confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such a person within six hours immediately following his arrest or other detention . . . .

18 U.S.C. § 3501(c) (emphasis added).

At the time of her May 5, 2022, interview and Defendant's statements to SA Nilson and Criminal Investigator Richardson, Defendant was <u>not</u> subject to the provision of Rule 5(a) or § 3501(c) as discussed in <u>Corley</u> because Defendant had been arrested <u>only</u> on charges in Red Lake Tribal Court. As the United States Supreme Court has explained, "it is evident" from the text of § 3501(a) "that the 'arrest or other detention' of which the subsection speaks must be an 'arrest or other detention' for a violation of *federal* law." <u>Alvarez-Sanchez</u>, 511 U.S. at 358 (emphasis in original). A "'delay' cannot occur until an officer has a duty to present a person to a federal magistrate judge," and "such a duty 'does not arise until the person has been arrested for a federal offense.'" <u>United States v. Pugh</u>, 25 F.3d 669, 674 (8th Cir. 1994) (emphasis in original) (quoting <u>Alvarez-Sanchez</u>, 511 U.S. at 358). Thus, the presentment obligation imposed by Rule 5(a)(1)(A), implicitly referenced by 18 U.S.C. § 3501(c), does not arise until a person has been arrested for a federal offense.

In the present case, Defendant was <u>not</u> indicted for the alleged violation of Federal law based on the alleged conduct underlying the present case until January 25, 2023. (Indictment [Docket No. 1]). There is no delay in Defendant's presentation because, at the time she made the

May 5, 2022, statements that she now seeks to suppress, "there was no obligation to present [her] to a federal magistrate judge." Pugh, 25 F.3d 674.

Defendant's central argument is that SA Nilson's intention was to build a record to eventually bring Federal charges and that had the Defendant not been an Indian living on the Red Lake reservation, the Defendant would have likely not had to wait more than two days. However, because Defendant was not charged Federally, there was simply no obligation to present her to a U.S. Federal Magistrate Judge. In addition, the Court finds no evidence on the present record that SA Nilson was using the "Red Lake Tribal Court as a holding cell for federal defendants" in violation of the Indian Civil Rights Act (25 U.S.C. 1302 et seq.). (Def.'s Memorandum in Support of Mot. to Dismiss and Suppress [Docket No. 180] at 19).

While Red Lake law enforcement and the Federal Government may have concurrent jurisdiction over alleged Indian Country criminal conduct, as already addressed supra, there is no evidence of collusion to violate Defendant's Civil Rights. See United States v. Williams, 104 F.3d 213, 216 (8th Cir. 1997) (noting that both the Supreme Court, in Bartkus v. Illinois, 359 U.S. 121, 123 (1959), and the Eighth Circuit, in United States v. Talley, 16 F.3d 972, 974 (8th Cir. 1994), "specifically recognized that [investigative] cooperation between state and federal authorities does not amount to unlawful collusion."). "Routine cooperation between local and federal authorities does not establish collusion; the exchange of information among law enforcement is important to crime prevention." United States v. Begay, No. 21-cr-119 (NEB/LIB), 2022 WL 683090, at *5 (D. Minn. Mar. 8, 2022) (discussing the cooperation between Red Lake law enforcement and federal law enforcement). Indeed, "cooperation between federal and state officials not only do[es] not offend the Constitution but [is] commonplace and welcome." United States v. Leathers, 354 F.3d 955, 960 (8th Cir. 2004).

Therefore, the undersigned recommends that Defendant's Motion to Suppress Statements, [Docket No. 110] be **DENIED** regarding the statements she made during her May 5, 2022, encounter with law enforcement.

## XII.   Defendant's Motion to Suppress Searches and Seizures. [Docket No. 111].

The Defendant lastly moves the Court to suppress evidence obtained as a result of a search of her residence on the Red Lake Indian Reservation, her cell phone, and her Facebook account. Each of these sources of evidence will be reviewed in turn.

### A.  Defendant's Home

Defendant argues that her May 3, 2022, consent to search her home, which she gave to law enforcement before the warrantless search, was not voluntary. "Whether consent was voluntarily given turns on a variety of factors, including a defendant's age, intelligence, and education; whether [she] cooperates with police; [her] knowledge of [her] right to refuse consent; and [her] familiarity with arrests and the legal system." United States v. Bearden, 780 F.3d 887, 895 (8th Cir. 2015).  Defendant cites Schneckloth v. Bustamonte, 412 U.S. 218. 242-43, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). Under Schneckloth, the Court held that when consent is given for a search, that consent must, in fact, be "voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances." Schneckloth, 412 U.S. at 248-249.

Going right to the facts, when Defendant arrived at her house after being driven by SA Nilson, he went over a consent to search form (Gov't Ex. 4) with her while standing outside the home. (Tr. 64; Gov't Ex. 3 0:00:00-0:03:45). Before going over the form, the Defendant began to audibly cry. (Gov't Ex. 3 0:00:00-0:00:46). SA Nilson gave Defendant some time to regain her composure, and then explained calmly that he and some of the law enforcement on scene

wanted to take some photos of both the inside and outside of the house, and then have Defendant come into the house to point out relevant things; all of this was to be done as quickly as possible so that they could leave. (Gov't Ex. 3 0:00:55-0:01:22).

Defendant mentioned that she felt a bit embarrassed to have law enforcement in her house because dirty laundry was visible. (Gov't Ex. 3 0:01:35-0:02:06). SA Nilson told Defendant that he did not mind any mess, but if she really did not want law enforcement to enter the house, she had the right to refuse.[15] After telling SA Nilson that she thought consenting would help show that she had nothing to hide, the Defendant signed the consent form. (Gov't Ex. 4).

Defendant's motion argues that she only has a ninth-grade education; she didn't understand that she had the right to refuse consent, and therefore, she had no real choice in the matter. (Def. Mot. to Suppress Searches and Seizures [Docket No. 111] at p. 2). However, there is nothing in the record that shows she did not understand that she had the right to refuse consent to a warrantless search of her home. Instead, Defendant has several moments to think about the consequences of law enforcement entering her home, going so far as to describe how she felt embarrassed due to its level of cleanliness to have officers inside. Defendant discusses how she viewed the search as a way to "help [her] in the long run" and as a way to be "honest" with law enforcement. In addition, Defendant was specifically told that she did not have to consent to the search of her residence. Thus, the Court finds that given the totality of the circumstances, Defendant's consent to search her home was voluntarily given and never withdrawn.

---

[15] The exact words which SA Nilson told Defendant are: "you have the right to refuse consent—you do not have to do this." To which the Defendant replied, "Well, why not? If—I mean—it is going to help me in the long run being honest, you know. I get what I did is wrong, but I am not trying to hide noting. You know, I don't want to be in jail for ever. I want to live my life. I want to make sure my kids are OK." (Gov't Ex. 3 0:02:06-0:03:18).

Accordingly, the undersigned recommends that Defendant's motion to suppress evidence obtained from the warrantless search of her home on the Red Lake Indian Reservation be **DENIED**.

**B. Defendant's Cell Phone**

Next, Defendant argues that Defendant's May 5, 2022, consent to search the content of her cell phone was involuntary given her then status of Tribal incarceration, the fact that she had not yet been appointed a lawyer or advocate by the Tribal Court, and she was not told she could refuse. (Def. Mot. to Suppress Searches and Seizures [Docket No. 111] at p. 2).

Looking at the facts as required by <u>Schneckloth</u>, the Defendant was told, from the very beginning of the interview, that she had the right to refuse to answer the requests from SA Nilson and any other law enforcement officer present in the May 5, 2022, interview. (Gov't Ex. 5 0:03:20-0:04:07). In fact, Defendant was read her rights under <u>Miranda</u> and read and acknowledged out loud her willingness to answer questions without a lawyer present. (Gov't Ex. 5 0:04:30-0:04:53, 0:04:53-0:05:08). During the interview, SA Nilson asked Defendant if she had recorded Minor Victim 1 on her cell phone, to which Defendant responded that she had. (Gov't Ex. 5 0:17:54). Defendant told law enforcement she recorded a family member hitting Minor Victim 1 with her cell phone. (Gov't Ex. 5 0:23:15).[16] In addition, Defendant told law enforcement that she took pictures of the scars on Minor Victim 1 and researched how to cover up scarring. (Gov't Ex. 5 0:24:25, 0:05:15).

SA Nilson eventually asked if Defendant would be willing to allow SA Nilson to go through her phone at that time so that he could see the videos which Defendant had previously described. (Gov't Ex. 5 0:55:30). Defendant then asked, "What if I say no" to which SA Nilson

---

[16] Defendant stated that she had erased many of the videos of the Defendant from her phone, but SA Nilson informed Defendant that such information can be recovered. (Gov't Ex. 5 0:17:54).

replied, "[t]hen we are not going to go through [the phone]." (Gov't's Ex. 5 0:55:40). SA Nilson went on to ask for a signed consent to search form as well and explained that Defendant did not have to sign. (Gov't's Ex. 5 at 0:55:55). Defendant then agreed to go through the contents of her cell phone with SA Nilson. (Gov't's Ex. 5 0:56:10).[17]

SA Nilson then went through her cell phone, starting with Defendant's photos. While looking through the photos, Defendant mentioned that she also posted her photos on Facebook. (Gov't's Ex. 5 0:59:00).[18]

Given the totality of the circumstances above, the Court finds that the Defendant voluntarily consented to viewing the contents of her cell phone with SA Nilson.

Finally, Defendant's passing challenge on the question of whether "there [was] a fair probability that contraband or evidence of a crime [would] be found in [the cell phone]" is also not meritorious. Illinois v. Gates, 462 U.S. 213, 238 (1983). Defendant argues that there was not a "fair probability" that evidence of assault or torture would be discovered on her cell phone. (Def. Mot. to Suppress Searches and Seizures [Docket No. 111] at p. 2) (quoting United States v. Alexander, 574 F.3d 484, 489 (8th Cir. 2009). However, the Defendant told officers that there were likely some videos on her cell phone that showed Minor Victim 1 being abused.[19] There is a "substantial basis" or "fair probability" that evidence may be found on Defendant's cell phone. Gates, 462 U.S. at 238-39.

---

[17] Specifically, Defendant said, "Yeah, well you are gonna [go through the phone] anyway." (Gov't's Ex. 5 0:56:25). SA Nilson then followed up on the question and asked again, "You're OK with us going through [the phone] with you right now" to which Defendant replied "Yes." (Gov't's Ex. 5 0:57:30; Gov't's Ex. 6 at p. 51). SA Nilson then asked an additional time if Defendant agreed to "visually go through" Defendant's cellphone with "INEIN number [ ] 356327119123237" to which Defendant replied, "Yes." (Gov't's Ex. 5 0:57:50; Gov't's Ex. 6 at p. 51).

[18] After watching several videos on the phone with Defendant's verbal permission SA Nilson asked Defendant again to complete the consent to search form for her cellphone. (Gov't's Ex. 5 1:33:50).

[19] Defendant mentions that she had a video of Minor Victim 1 relevant to the preset case on her phone, but she deleted it; however, SA Nilson informed Defendant that such a video would be recoverable even if it was deleted. (Gov't's Ex. 6 at pp. 16-17).

Accordingly, the undersigned recommends that Defendant's motion to suppress evidence obtained from her cellphone be **DENIED**.

### C. Defendant's Facebook Account

Defendant finally moves the Court to suppress evidence obtained from the search and seizure of data from Defendant's Facebook account. (Def. Mot. to Suppress Searches and Seizures [Docket No. 111] at p. 4). A search warrant for Defendant's Facebook data was signed by U.S. Magistrate Judge Tony N. Leung on November 4, 2022. (Gov't's Ex 10). Defendant argues that this search warrant is tainted by the illegality of the then warrantless consent search of Defendant's cell phone and her May 5, 2022, interview statements. (Defendant's Memo. [Docket No. 180] at p. 21; Gov't's Ex. 10 at p. 1).[20] The at issue warrant's supporting affidavit contains excerpts from conversations on Facebook Messenger found during the May 5, 2022, consent search regarding potential abuse to Minor Victim 1,[21] and the affidavit contends that the data contained on Defendant's Facebook may be related to Minor Victim 1's abuse and may also demonstrate the deterioration of Minor Victim 1's condition over time. (Gov't's Ex 10, affidavit ¶ 25).

As such, for the reasons set forth above, the Court finds that there was probable cause for the warrant for the search and seizure of data from Defendant's Facebook account. In addition, there is no taint of this warrant for the reasons addressed supra; the Court has determined that there were no prior constitutionally infirm statements taken or warrantless searches conducted. As such,

---

[20] FBI SA Nilson obtained a search warrant for Defendant's cell phone, which was signed on August 5, 2022. (Gov't's Ex. 9 at p. 5). Defendant's does not challenge this warrant outside of the aforementioned challenges to the warrantless search and interrogation conducted at the Red Lake Jail on May 5, 2022. SA Nilson used information both from the warrantless search and interrogation as well as information from the search conducted on the cell phone after the August 4, 2022, warrant was issued in support of his application for a search warrant concerning Defendant's Facebook data. (Gov't's Ex. 10 at p. 12-14).

[21] These conversations, described in paragraphs 19-24, illustrate how Minor Victim 1 had scars and how she believed the abuse of only one of Defendant's six children was evidence against her abusing her foster child, Minor Victim 1.

the Court does not find that the search of Defendant's Facebook account was tainted by any prior illegal search occurring on May 3 or 5, 2023.

Accordingly, the undersigned recommends that Defendant's motion to suppress evidence obtained from her Facebook account be **DENIED**.

## XIII. Conclusion

Thus, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1. The Government's Motion for Discovery, [Docket No. 31], is **GRANTED**, as set forth above;

2. Defendant's Motion for Discovery and Inspection, [Docket No. 104], is **GRANTED** in part and **DENIED** in part, as set forth above;

3. Defendant's Motion to Compel Disclosure of Evidence Favorable to the Defendant, [Docket No. 105], is **GRANTED**, as set forth above;

4. Defendant's Pretrial Motion for Disclosure of 404(b) Evidence, [Docket No. 107], is **GRANTED**, as set forth above;

5. Defendant's Pretrial Motion to Retain Rough Notes and Evidence, [Docket No. 109]; is **GRANTED**, as set forth above.

6. Defendant's Motion for Pretrial Disclosure of Early Jencks Act Material, [Docket No. 108], is **DENIED**; and

Further, **IT IS HEREBY RECOMMENDED THAT**:

1. Defendant's Motion to Dismiss, [Docket No. 103], be **DENIED**;

2. Defendant's Motion to Strike Surplusage, [Docket No. 106], be **DENIED**;

3. Defendant's Motion to Suppress Statements, [Docket No. 110], be **DENIED**; and

4. Defendant's Motion to Suppress Searches and Seizures, [Docket No. 111], be

   **DENIED**.

Dated: November 30, 2023                      /s/Leo I. Brisbois

                                              Hon. Leo I. Brisbois
                                              U.S. MAGISTRATE JUDGE

# N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.