UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | No. 23-cr-23 (KMM/LIB) |
| Plaintiff, | |
| v. | **ORDER** |
| 1. Trina Mae Johnson, | |
| Defendant. | |

The government charges Defendant Trina Mae Johnson and others with child abuse by torture in violation of 18 U.S.C. §§ 1151, 1153, and Minn. Stat. § 609.3775; child neglect through deprivation of food and health care in violation of 18 U.S.C. §§ 1151, 1153 and Minn. Stat. §§ 609.05, 609.378, subd. 1(a)(1); child endangerment in violation of 18 U.S.C. § 1151, 1153, and Minn. Stat. §§ 609.05, 609.378, subd. 1(b)(1); and assault on a minor with a dangerous weapon in violation of 18 U.S.C. §§ 113(a)(3), 1151, 1153(a), and 3559(f)(3). [Indictment, Dkt. 1.] The government asserts that the events giving rise to the charges took place within the boundaries of the Red Lake Indian Reservation, in the State and District of Minnesota, and at all relevant times, Ms. Johnson, the other Defendants, and the minor victim were enrolled members of the Red Lake Band of Chippewa Indians.

Ms. Johnson filed pretrial motions to dismiss the Indictment [Dkt. 103], to strike surplusage from the Indictment [Dkt. 106], to suppress statements [Dkt. 110], and to suppress evidence [Dkt. 111]. United States Magistrate Judge Leo I. Brisbois held a

hearing on September 7, 2023, at which he heard testimony and received other evidence concerning the motions. [Sept. 7, 2023 Hr'g Tr. ("Tr."), Dkt. 173.] The parties submitted post-hearing briefing, and on December 1, 2023, Judge Brisbois issued a Report and Recommendation ("R&R") recommending that each of Ms. Johnson's motions be denied. [R&R, Dkt. 187.] Ms. Johnson filed timely objections to the R&R. [Objections, Dkt. 191.] Having conducted the required de novo review, the Court accepts the R&R, overrules the objections, and denies Ms. Johnson's motions.

## I. Motion to Strike Surplusage [Dkt. 106]

Ms. Johnson moved for an Order striking descriptions from Paragraph 4 of the Indictment of the minor victim's torture as prejudicial surplusage pursuant to Federal Rule of Criminal Procedure 7(d). [Dkt. 106.] In the R&R, Judge Brisbois found that Ms. Johnson failed to meet "her significant burden to show that the allegations contained in the Indictment are either irrelevant or contain the type of inflammatory and prejudicial matter that would warrant the Court to strike surplusage." [R&R at 18.] Instead, he found that the allegations regarding the minor victim's starvation, deprivation of sleep, assaults, threats, withholding of medical care, and social isolation resulting in serious and substantial physical, mental, and emotional harm "plainly, albeit comprehensively, describe alleged facts which are the very basis for the crimes with which [Ms. Johnson] is charged." [*Id.*] In her Objections, Ms. Johnson disagrees with these findings, asserts that the listing of injuries is unnecessary, fails to take into account that other defendants have entered guilty pleas, and is inflammatory and prejudicial. She argues that "[g]iven the

severity of the penalties, it's not a big ask" to strike these matters from the Indictment. [Objections at 35.]

These Objections are overruled. Rule 7(d) allows a district court to "strike surplusage from the indictment or information." The decision is discretionary. *United States v. Figueroa*, 900 F.2d 1211, 1218 (8th Cir. 1990). A defendant's motion under Rule 7(d) "should be granted only where it is clear that the allegations contained therein are not relevant to the charge made or contain inflammatory and prejudicial matter." *United States v. Morales*, 813 F.3d 1058, 1066 (8th Cir. 2016) (cleaned up).

The allegations at issue are plainly relevant to the charges, and Ms. Johnson does not argue otherwise. Although some defendants have entered guilty pleas, the Indictment still alleges a conspiracy among a group of adults to torture and abuse a minor victim. And the same allegations regarding the harm inflicted on the minor victim are straightforward and are not unnecessarily descriptive, grotesque, or sensational.[1] Finally, it is very likely that the jury will hear even more graphic terms during testimony at trial than those used to summarize the allegations in the Indictment. For these reasons, the motion to strike surplusage is denied.

## II.    Motion to Dismiss [Dkt. 103]

Ms. Johnson moved to dismiss the Indictment. She argued that in light of recent Supreme Court decisions—particularly observations by Justice Neil Gorsuch in dissent in *Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022), and a concurrence from Justice

---

[1] By comparison, the Indictment does not refer to the minor victim as having been "burned," "scarred," "emaciated," or being in "horrible shape," which were all terms used to describe the minor victim's condition at the evidentiary hearing. [Tr. 82, 107.]

3

Kavanaugh in *Haaland v. Brackeen*, 599 U.S. 255 (2023)—the Red Lake Reservation can no longer be considered a separate sovereign. Further, Ms. Johnson contended that the manner in which her case was handled by the the Tribal Court denied her the right to equal protection of the laws, the right to immediate due process, and the right to a speedy trial. [Dkt. 103.] She argued that while her Tribal Court case was ongoing, she was denied protections she would have received in state or federal court, such as bail, representation by an attorney, and access to discovery. She further suggested that through their simultaneous investigation of the same conduct, tribal and federal investigators colluded to deny her such protections by funneling her first through the Tribal Court system. [Dkt. 180.]

   Judge Brisbois recommended the motion be denied. First, he explained that there was no evidence in the record that the Red Lake Tribe, its law enforcement officers, prosecutors, or Court officials were operating under the direction of the federal government in Ms. Johnson's tribal case. [R&R at 19.] Judge Brisbois found that the evidence showed federal authorities were aware of a potential crime and that both federal and tribal law enforcement cooperated in the investigation, but such cooperation is not impermissible. [R&R at 19.] Next, Judge Brisbois disagreed with Ms. Johnson's assertion that recent Supreme Court decisions undermine tribal sovereignty. [R&R at 19–20 & n.12.] Third, Judge Brisbois rejected Ms. Johnson's equal protection argument, finding that courts have repeatedly disagreed with the proposition and considered distinctions between tribal court and state defendants to be a political, as opposed to a race-based classification, owing to the quasi-sovereign status of Indian tribes under federal law.

4

[R&R at 20.] Finally, Judge Brisbois concluded that Ms. Johnson's complaints about procedures in Tribal Court do not present any equal protection grounds for dismissal of the federal Indictment in this case. [R&R at 20–21.]

Ms. Johnson first objects to Judge Brisbois' conclusion that there is no evidence in the record that the Tribe operated under the direction and control of the federal government in her tribal case. She contends that the failure of tribal prosecutors to provide discovery and the decisions to continue her tribal case on several occasions was "only for the benefit of the United States," and asserts that Judge Brisbois ignored testimony from Ms. Johnson's tribal lay advocate, Clayton Van Wert, that the head tribal prosecutor made him aware "that the F.B.I. was the primary focus of the investigation they were conducting." Further, she argues that the Tribal Court failed to act as an independent sovereign and the FBI controlled the investigation. [Objections at 14–16.] These objections are overruled. The Court has reviewed the entire transcript from the evidentiary hearing and the exhibits on file and finds no evidence of the collusion suggested by the defense. The quoted testimony from Mr. Van Wert acknowledges his awareness that a federal investigation was going on while the tribal case was pending and that while he may have been told "another government agency . . . was involved," the FBI was taking the lead. [Tr. 36.] This is a far cry from evidence indicating that the Tribe was operating under the direction of the federal government. Indeed, as Judge Brisbois correctly observed, Mr. Van Wert testified that he was not aware of federal authorities having been involved in setting of any dates in Ms. Johnson's tribal case, he had no indication that the federal government was involved in the tribal court's bail decisions,

5

and he had no information that the federal government was involved in any way in the tribal court's discovery rules. [Tr. 44–45.] Further, Ms. Johnson's suggestion that Judge Brisbois reached the "absurd conclusion" that the federal government was unaware of the events taking place in the Tribal Court proceedings flatly misrepresents the R&R's findings. In any event, Ms. Johnson fails to demonstrate that the Tribe and its officers, prosecutors, and Tribal Court officials failed to act as a sovereign.

Next, Ms. Johnson objects to Judge Brisbois' conclusion that recent Supreme Court jurisprudence has not undermined tribal sovereignty. As she did before the Magistrate Judge, Ms. Johnson argues that the effect of the *Castro-Huerta* majority's observation that "[n]othing in ... Pub. L. 280 indicates that it was meant to divest States of pre-existing and otherwise lawfully assumed jurisdiction," 597 U.S. at 647–48, is that "Reservations no longer have 'tribal self-government.'" [Objections at 18–19 (quoting *Castro-Huerta*, 597 U.S. at 693 (Gorsuch, J., dissenting).] Contrary to Ms. Johnson's argument, the Court agrees with the R&R's conclusion that *Castro-Huerta* casts no doubt on the long recognized distinct sovereignty of Indian nations generally or the Red Lake Nation in particular. The *Castro-Huerta* Court held that "the General Crimes Act does not preempt state jurisdiction over crimes committed by non-Indians against Indians in Indian country," 597 U.S. at 647; that "Public Law 280 does not preempt state authority to prosecute crimes committed by non-Indians against Indians in Indian country," *id.* at 649; and "that the Federal Government and the State have concurrent jurisdiction over crimes committed by non-Indians against Indians in Indian country," *id.* at 655. Nowhere does the *Castro-Huerta* decision purport to unravel principles of tribal self-government

or eliminate tribal sovereignty. *See United States v. Mazurie*, 419 U.S. 544, 557 (1975) (observing that "Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory, [and] they are a separate people possessing the power of regulating their internal and social relations"). This objection is overruled.

Finally, Ms. Johnson objects to the R&R's rejection of her equal protection claim, arguing that the Indictment should be dismissed on equal protection grounds because she received comparatively insufficient procedural protections than a similarly situated non-Indian would have been afforded. Ms. Johnson contends that her claim is supported by Justice Brett Kavanaugh's concurrence in *Haaland v. Brackeen*, 599 U.S. 255 (2023). Ms. Johnson acknowledges that the *Haaland* Court did not reach the equal protection issue, and instead resolved the case by finding that neither the non-Indian foster and adoptive parents, nor the State of Texas had standing to assert an equal protection challenge to the Indian Child Welfare Act's preferences for placements of Indian children with Indian families. *See id.* at 292–96. Nevertheless, Ms. Johnson finds "encouragement" in Justice Kavanaugh's concurrence, arguing that it is no longer viable to view distinctions based on tribal membership as non-racial classifications and that she was treated differently during the investigation of this case and the tribal proceedings merely because she is an Indian. [Objections at 21–23.]

The Court finds these objections unpersuasive and concludes that dismissal of the Indictment on equal protection grounds is not required. Of course, concurring opinions, like that relied upon by Ms. Johnson here, have no binding precedential value. *See, e.g.*,

7

*Maryland v. Wilson*, 519 U.S. 408, 412–13 (1997) (disregarding a statement "contained in a concurrence" along with a statement of dictum because "neither constitutes binding precedent"). Moreover, the Supreme Court has treated classifications based on tribal membership as "political rather than racial in nature." *Morton v. Mancari*, 417 U.S. 535, n.24 (1974) (finding that employment preference for qualified Indians in the Bureau of Indian Affairs provided for in the Indian Reorganization Act of 1934 did not violate equal protection); *Haaland*, 599 U.S. at 274 (relying on *Morton*, 417 U.S. at 551–52 for the proposition that "principles inherent in the Constitution's structure empower Congress to act in the field of Indian affairs").

As Judge Brisbois explained, courts have routinely rejected similar equal protection arguments because distinctions based on tribal membership are not considered race-based. *See United States v. Cavanaugh*, 643 F.3d 592, 605 (8th Cir. 2011) (stating that "distinctions based upon tribal affiliation were not invidious race-based distinctions; they were distinctions based upon the quasi-sovereign status of Indian tribes under federal law") (quoting *United States v. Antelope*, 430 U.S. 641, 644 (1977)) (cleaned up); *United States v. Stately*, No. 19-cr-342 (ECT/LIB), 2021 WL 1321269, at *15–18 (D. Minn. Jan. 11, 2021), *R&R adopted*, 2021 WL 1187152 (D. Minn. Mar. 30, 2021);

*United States v. Archambault*, 206 F. Supp. 2d 1010, 1017–18 (D.S.D. 2002).[2] Ms. Johnson has not provided a persuasive reason to depart from these cases.

For these reasons, Ms. Johnson's motion to dismiss is denied.

### III.    Motion to Suppress Statements [Dkt. 110]

#### A.   May 3, 2022 Statements

Ms. Johnson moved to suppress statements she made during a May 3, 2022 interview at the F.B.I. field office, arguing that the she was in custody at the time of the interview and was subjected to direct questioning without being provided *Miranda* warnings. [Dkt. 110; Dkt. 180 at 14–17.]. Judge Brisbois recommended denial of this motion. He reasoned that the factors enumerated in *United States v. Griffin*, 922 F.3d 1343, 1349 (8th Cir. 1990) support a conclusion that Ms. Johnson was not in custody, so no *Miranda* warnings were necessary, and suppression was not required. [R&R at 21–29.] Ms. Johnson objects to that conclusion. She contends that the interview in the Bemidji office was police dominated; that she was neither cunning, nor sophisticated; that her freedom to depart was restricted, and even though she was not placed under formal arrest, she "was in the [FBI] Agent's control [after the interview concluded] as well." Further, she asserts that the FBI Agent made disingenuous promises about Ms. Johnson's freedom to walk away and that the plan was for her to be arrested all along

---

[2] The *Archambault* court explained that the mechanism for raising "equal protection and due process objections to the exercise of criminal jurisdiction by a tribe or to the procedure applicable in tribal court is to present and seek a ruling on these objections as part of his tribal prosecution. Then, if the tribal court does not provide him relief, his objections can be made to the District court vis a vis a petition for habeas corpus under 25 U.S.C. § 1303 challenging the legality of his detention by order of an Indian tribe." 206 F. Supp. 2d at 1018.

based on the collective knowledge of both tribal and federal law enforcement officials. [Objections at 26–28.]

These objections are overruled because the totality of the circumstances surrounding the May 3, 2022 interview do not support a finding of custody. *United States v. Treanton*, 57 F.4th 638, 642 (8th Cir. 2023) (considering totality of the circumstances in evaluating custody issue). Ms. Johnson was in the presence of only two law enforcement officers, FBI Agent Ryan Nilson and Alea Richardson of the Red Lake Police Department. Ms. Johnson went to the FBI Field Office voluntarily after receiving a call from Agent Nilson, and she met with them in a "child adolescent forensic interview room" or "soft interview room," which contains two chairs, a lamp, and a table. [Tr. 54.] Agent Nilson told her she was not under arrest and she was free to leave at any point. [Gov't Ex. 2 at 3; Tr. 57.] Ms. Johnson was never placed under any physical restraint throughout the entire interview. [Tr. 57.] Agent Nilson never told Ms. Johnson she was not free to leave, never threatened her, and made no promises to her about what would or wouldn't happen if she spoke with him. [Tr. 58.] Agent Nilson never brandished a weapon or raised his voice and Ms. Johnson never suggested that she was unsure whether she could leave if she wished. [Tr. 58–59.] The interview was conducted in a conversational manner, without raised voices. Ms. Johnson never asked to end the interview.

The interview lasted approximately two and a half hours, during which Ms. Johnson made statements about the abuse of the minor victim and her role in it. [Tr. 60.] Toward the end of the interview, Agent Nilson discussed going to Ms. Johnson's

10

home because he needed to take some photographs. [Gov't Ex. 2 at 95.] Ms. Johnson expressed that she wanted to be honest and admitted to being scared [*id.*], but toward the end of the interview she made a phone call to her boyfriend, encouraged him to be honest in talking to the FBI, and acknowledged she was not under arrest, [*id.* at 111; Tr. 61–62]. She also agreed to ride in the car with Agent Nilson and another female agent to Ms. Johnson's home. [Gov't Ex. 2 at 111.] The ride to Ms. Johnson's home took about 40 to 45 minutes. [Tr. 63.] During the car ride,[3] Ms. Johnson did not suggest that she did not want the officers to go to her house. [Tr. 63.] She consented to a search of her home, and officers walked through the home with her, after which she went back outside the home. At that point, "the tribal police department placed [Ms. Johnson] under arrest" for child abuse charges under the tribal code. [Tr. 68.] Agent Nilson did not direct tribal officers to arrest Ms. Johnson. [Tr. 69.]

The Court finds no reason to disagree with Judge Brisbois' application the *Griffin* framework to the facts of this case. Ultimately, based on its own de novo review, the Court concludes that this was not a situation where Ms. Johnson was restrained to a degree comparable to a formal arrest. *Treanton*, 57 F.4th at 641; *United States v. Czichray*, 378 F.3d 822, 828 (8th Cir. 2004). Under these circumstances, the Court finds that during the May 3, 2022 interview "a reasonable person in Ms. Johnson's position would have felt free to terminate the questioning and leave." *Treanton*, 57 F.4th at 641 (quotations omitted). Ms. Johnson suggests that Agent Nilson acted deceptively during

---

[3] Ms. Johnson sat in the front passenger seat next to Agent Nilson, rather than in the "cage" in the back. [Tr. 62–63.]

11

that interview, but she does not point to any coercive aspects of the interview that a reasonable person would perceive as a restriction on her freedom to depart. *See United States v. LeBrun*, 363 F.3d 715, 721 (8th Cir. 2004) ("[S]ome degree of coercion is part and parcel of the interrogation process and ... the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart."). Similarly, although Ms. Johnson emphasizes her arrest after the interview had concluded, she does not explain how the post-interview arrest indicates that a reasonable person in her position would not have felt free to terminate the interview *while the questioning was happening*. Here, rather than suggesting that the officers had Ms. Johnson in custody all along and attempted to circumvent *Miranda*'s requirements, the post-interview arrest indicates that during the interview, Ms. Johnson's inculpatory statements provided the necessary probable cause. *See Treanton*, 57 F.4th at 643 (Stras, J., concurring) ("[W]hile an interview that ends in arrest *may indicate* a custodial setting, that is not dispositive, especially when the interview arises from reasonable suspicion and the suspect's answers provide probable cause for the arrest.'") (quoting *United States v. Sanchez-Velasco*, 956 F.3d 576, 581 (8th Cir. 2020)) (emphasis from *Treanton*). For these reasons, the motion to suppress the May 3, 2022 statements is denied.[4]

---

[4] The Court also finds no merit to Ms. Johnson's argument that her May 3, 2022 statements were "involuntary" because the evidence established that it was not "extracted by threats, violence, or express or implied promises sufficient to overbear [her] will and critically impair [her] capacity for self-determination." *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) (quotations omitted).

12

### B. May 5, 2022 Statements

In her motion to suppress statements, Ms. Johnson also argued that the statement she made to Agent Nilson following her arrest on May 5, 2022 is inadmissible because it was the product of undue delay in her presentment to a United States Magistrate Judge under Federal Rule of Criminal Procedure 5(a) and 18 U.S.C. § 3501. She argued that she was being held in the Red Lake Tribal jail without having appointed counsel in violation of 25 U.S.C. § 1302(a)(6) and (7), and Agent Nilson, knowing that Ms. Johnson would eventually be federally charged, took advantage of the situation by having her sign a waiver and questioning her during this period of improper delay. [Dkt. 110 at 4–5.] Judge Brisbois recommended the motion be denied with respect to the statement Ms. Johnson made on May 5th. He found that "[a]t the time of her May 5, 2022, interview and Defendant's statements to SA Nilson and Criminal Investigator Richardson, Defendant was not subject to the provision of Rule 5(a) or § 3501(c)...." [R&R at 30.] Judge Brisbois concluded that because Ms. Johnson was not indicted for alleged violations of federal law until January 25, 2023, there was no obligation to present her to a magistrate judge pursuant to Rule 5 or § 3501 at the time she made the statements at issue. [R&R at 30–31.] Further, he rejected Ms. Johnson's contention that Agent Nilson manipulated Ms. Johnson's tribal custody to build a case for federal charges while depriving her of procedural protections because he found "no evidence on the present record that SA Nilson was using the 'Red Lake Tribal Court as a holding cell for federal defendants' in violation of the Indian Civil Rights Act...." [R&R at 31 (quoting Dkt. 180 at 19).]

Ms. Johnson objects. Essentially, she argues that, contrary to the findings of the R&R, the record establishes that Agent Nilson "took unfair advantage of a delay in Red Lake . . . to secure a second confession," depriving her of due process rights, and subjecting her to the allegedly inferior practices of Red Lake Tribal Court. [Objections at 30–32.] This objection is overruled for two reasons. First, she points to no legal authority to suggest that when a member of the Red Lake Band is arrested under the tribal code and held in the tribal jail awaiting charges, that the provisions of Fed. R. Crim. P. 5(a) or 18 U.S.C. § 3501(c) apply. Ms. Johnson has not identified any legal infirmity with the conclusion that the obligation of presentment was inapplicable to someone in purely tribal custody. *Corley v. United States*, 556 U.S. 303, 316 (2009); *United States v. Alvarez-Sanchez*, 511 U.S. 350, 354 (1994); *United States v. Pugh*, 25 F.3d 669, 674 (8th Cir. 1994).

Second, Ms. Johnson's accusations of wrongdoing on the part of Agent Nilson are unsupported by the record. For example, she again points to Mr. Van Wert's testimony regarding his conversations with tribal prosecutors about the FBI's involvement in the investigation, but as before, she mischaracterizes that testimony. She asserts that Mr. Van Wert testified that the tribal prosecutor was "aware . . . that the FBI was 'the primary focus of the investigation they were conducting'" and implies that this is evidence there was never really any distinction between the federal and tribal authorities in this case. [Objections at 31 (quoting Tr. 36).] But Mr. Van Wert simply testified that he recalled being informed there may have been another agency in the investigation, but the FBI was taking the lead on the federal side. [Tr. 36.] Further, Ms. Johnson suggests that Agent

Nilson "predicted with certainty" that there would be a federal indictment, further evincing a disingenuous separation between federal and tribal authorities in this scenario. [Objections at 31–32 (citing Tr. 86).] But Agent Nilson testified that he could not "say 100 percent" that this was "going to go federal" because seeking an indictment is not his decision to make. [Tr. 86.]

Finally, Ms. Johnson asserts that there is evidence Agent Nilson took unfair advantage of the lack of a presentment right in Red Lake Tribal Court because he "wanted more than five years in prison and he knew he couldn't get that amount of time in the Tribal Court setting." [Objections at 31 (citing Tr. 97).] But the cited portion of the record does not support a conclusion that Agent Nilson intentionally violated Ms. Johnson's rights. During the hearing, defense counsel and Agent Nilson recounted portions of the May 5th discussion between Nilson and Ms. Johnson, including Ms. Johnson's statements that she didn't "want to die in jail," her statement that she thought five years would be fair, and Nilson's awareness that a five-year sentence exceeded the penalties available in tribal court. [Tr. 97.] Certainly, this is indicative of the fact that Agent Nilson was pursuing an investigation into possible federal charges. But there is nothing surprising about Agent Nilson doing that—after all, he is an investigator for the Federal Bureau of Investigation. Meanwhile, the record shows that Agent Nilson thoroughly discussed Ms. Johnson's rights with her before the interview, told her it was important that she understood those rights, and informed her that she could cease the interview at any time. [Gov't Ex. 6 at 4–6.] Agent Nilson was not even aware until the evidentiary hearing on the suppression motions in this case that Ms. Johnson was not

15

charged in tribal court until May 6th. [Tr. 94–95.] This evidence undermines the suggestion that Agent Nilson set out to take unfair advantage of an alleged delay in the bringing of formal tribal charges. For these reasons, the motion to suppress the May 5th statements is denied.

## IV. Motion to Suppress Evidence [Dkt. 111]

### A. May 3, 2022 Search of Home

Ms. Johnson moved to suppress evidence obtained from the May 3, 2022 search of her home on grounds that she did not voluntarily consent to the search, pointing out that she has only a ninth-grade education. [Dkt. 111 at 2.] Further, she argued that her consent was involuntary because it came on the heels of "prolonged" questioning during the interview and was obtained based on the "misleading pretense . . . that she was free to go [at] anytime when she signed" the consent form. In addition, she asserted that "[a]t the very least, Agent Nilson should have told Ms. Johnson that, once she signed the consent form, she'd be arrested. He decided to mislead her by omission." [Dkt. 180 at 17–18.] Judge Brisbois recommended this motion be denied because, based on the totality of the circumstances, Ms. Johnson understood she had the right to refuse consent, gave her consent to the search voluntarily, and never withdrew that consent. [R&R at 32–33.]

In her objections to this conclusion, Ms. Johnson repeats the same arguments she made in post-hearing briefing to the Magistrate Judge. [*Compare* Objections at 29–30, *with* Dkt. 180 at 17–18.] Having conducted the required de novo review and considered Ms. Johnson's arguments, the Court finds that she voluntarily consented to the search of her home on May 3, 2022. *United States v. Harris*, 55 F.4th 575, 581 (8th Cir. 2022)

16

(listing relevant factors for consideration, including the "defendant's age, intelligence, and education; whether he cooperates with police; his knowledge of his right to refuse consent; and his familiarity with arrests and the legal system") (quotations omitted). The R&R accurately recounts the facts in the record relevant to Ms. Johnson's consent, including: (1) she began to cry when Agent Nilson began going over the consent form [Gov't Ex. 3 0:00–0:50]; (2) she expressed embarrassment at the visible dirty laundry inside her home [*id.* 1:30–2:10]; (3) she was advised by Agent Nilson that she had the right to refuse consent if she did not want officers to come in [*id.* 2:30–3:00]; and (4) she signed the consent form after she told Agent Nilson she thought it would help demonstrate she had nothing to hide [*id.* 3:00–4:20]. [R&R at 32–33.] Ms. Johnson also expressed an understanding that "being honest" could help her "in the long run." [R&R at 33 & n.15 (quoting Gov't Ex. 3 at 0:02:06–0:03:18).] Ms. Johnson is 49 years old. [Tr. 59.] She attended high school until the ninth grade, and there is no indication she has further education. However, there is no evidence in the record indicating that Ms. Johnson lacked the capacity to make a knowing and voluntary choice of whether to allow law enforcement to search her residence. Although she has some familiarity with the legal system, it appears to be limited to traffic infractions and one prior conviction for driving while intoxicated in 2019. [*See* Tr. 59.] Nevertheless, this limited experience alone does not mean she is incapable of giving voluntary consent to a search. She appeared to Agent Nilson to be of average intelligence and did not appear impaired or under the influence of any substances on the date in question. [Tr. 59–60.] Moreover, there is no evidence that at the time she gave consent, any law enforcement official

17

"threatened, intimidated, punished, or falsely promised something to [her]." *Harris*, 55 F.4th at 581 (quotations omitted). She was not under arrest at the time, and she gave consent just outside her home, rather than in a "secluded area." *Id.*

Considering the totality of these circumstances, the Court finds that Ms. Johnson voluntarily consented to the search of her home. Therefore, the motion to suppress is denied in this respect.

## B. Cell Phone Search

Ms. Johnson also moved to suppress evidence obtained as a result of the search of her cell phone. She argued that although she consented to the search, that consent was involuntary. Further, she asserted that although the FBI obtained a search warrant for the search of the cell phone's contents, the probable cause for the warrant was generated by statements she made during the May 5th interview while she was in custody in the Red Lake jail. [Dkt. 111.] In post-hearing briefing, Ms. Johnson clarified her position. She argued that the issuing judge did not have a "substantial basis" to find probable cause because the statement she made on May 5th, which was included in the probable cause showing, was obtained in violation of the timely presentment requirement. [Dkt. 180 at 21.][5] Judge Brisbois found that Ms. Johnson voluntarily consented to the search of the contents of her cell phone and that there was a sufficient basis for the issuing judge to

---

[5] In her motion, Ms. Johnson suggested that the warrant was infirm because it was premised on inculpatory statements she made in the May 5th interview that were taken in the absence of *Miranda* warnings and were not provided voluntarily. [Dkt. 111 at 3–4.] She appears to have subsequently abandoned that argument. In any event, the May 5th interview was preceded by an advisement of rights and Ms. Johnson's valid waiver. [Gov't Ex. 7.]

18

find probable cause to issue the warrant. Accordingly, he recommended the motion to suppress evidence obtained from the cell phone search be denied. [R&R at 34–36.]

In her objections, Ms. Johnson asserts that she is raising a "four corners challenge" to the warrant authorizing the search of her phone, and as she argued in her post-hearing memorandum, she contends that the evidence obtained from her phone must be suppressed because the "warrant is based upon a statement obtained by lack of timely presentment. Without her statements, the warrant lacks a connection, or nexus, to the alleged crime." [Objections at 32–33.] Because the Court concludes above that there is no merit to her delayed-presentment argument, this argument is also rejected. To the extent Ms. Johnson otherwise challenges the facial sufficiency of the warrant's probable cause showing, the record amply demonstrates that there was probable cause for a search of the phone based on Agent Nilson's affidavit recounting Ms. Johnson's admissions of the abuse of the minor victim and having "recorded multiple videos on the **Device** ... including at least one of him being assaulted."[6] *United States v. Daigle*, 947 F.3d 1076, 1081 (8th Cir. 2020) ("As a reviewing court, we pay 'great deference' to the probable cause determinations of the issuing judge or magistrate, and our inquiry is limited to discerning whether the issuing judge had a substantial basis for concluding that probable cause existed.").

For these reasons, the motion to suppress evidence obtained from Ms. Johnson's cell phone is denied.

---

[6] Gov't Ex. 9, Aff. ¶¶ 14–16 (emphasis in original).

### C. Facebook Warrant

Finally, Ms. Johnson sought suppression of evidence obtained pursuant to a search warrant for information from Facebook related to her Facebook account. She argued that this warrant was "tainted by the illegality of the first." [Dkt. 111 at 4; Dkt. 180 at 21.] Judge Brisbois recommended this motion be denied [R&R at 36–37], and Ms. Johnson objects to that recommendation on grounds that the Facebook warrant is tainted by the illegality of the cell phone warrant, [Objections at 33–34]. However, for reasons stated above, the cell phone warrant suffers from no illegality, and the Facebook warrant is not tainted. Accordingly, the motion to suppress evidence obtained pursuant to it is denied.

## V. Order

For the reasons discussed above, **IT IS HEREBY ORDERED THAT**

1. The Report and Recommendation [Dkt. 187] is **ACCEPTED**.
2. Ms. Johnson's Objections [Dkt. 191] are **OVERRULED**.
3. The Motion to Dismiss [Dkt. 103] is **DENIED**.
4. The Motion to Strike Surplusage [Dkt. 106] is **DENIED**.
5. The Motion to Suppress Statements [Dkt. 110] is **DENIED**.
6. The Motion to Suppress Evidence [Dkt. 111] is **DENIED**.

Date: January 29, 2024         *s/Katherine Menendez*
                               Katherine Menendez
                               United States District Judge